

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SYNYGY, INC. | : | CIVIL ACTION |
| | : | No. 07-3536 |
| v. | : | |
| | : | |
| ZS ASSOCIATES, INC., et al. | : | |
| | | |
| O'NEILL, J. | | February 11, 2015 |

## MEMORANDUM

Now before me are four summary judgment motions by Novo Nordisk, Inc., ZS

Associates, Inc. and ZS Associates International, Inc. (collectively, defendants) for summary

judgment on the issues of: (1) causation (Dkt. No. 178); (2) Synygy's trade secrets claims (Dkt.

No. 179); (3) Synygy, Inc.'s copyright claims (Dkt. No. 180); and (4) Synygy's state law claims

for unfair competition, breach of contract, tortious and intentional interference, conversion and

unjust enrichment/quantum meruit (Dkt. No. 181).[1] For the reasons that follow, I will: (1) deny

defendants' motion for summary judgment on causation; (2) grant in part and deny in part

defendants' summary judgment motion on trade secrets; (3) grant in part and deny in part

defendants' summary judgment motion on copyright; and (4) grant in part and deny in part

defendants' motion for summary judgment on plaintiff's state law claims.

## BACKGROUND

The claims in this case arise out of incentive compensation or "IC" services that Synygy

and ZS delivered to Novo, a pharmaceutical company.  IC "is focused on structuring and

delivering the correct financial incentives to motivate the performance of sales representatives

. . . and managers."  Defs.' Causation Mem. at 6.  Synygy and ZS "compete in providing

---

[1]     Also pending in this case is Synygy's motion for summary judgment with respect
to ZS's counterclaims for defamation, commercial disparagement and alleged violations of the
Lanham Act (Dkt. No. 37 in Civ. A. No. 10-4274).  I will decide this motion separately.

software and services for managing sales compensation, sales quotas, and sales objectives." ZS's Answer to Second Am. Compl. at ¶ 34. "Synygy is a global software and services company in the business of providing sales compensation management . . . and sales performance management . . . software and services to its clients, many of whom are in the pharmaceutical industry." Second Am. Compl. ¶ 10. "ZS is a global management consulting firm specializing in sales and marketing strategy, operations, and execution that, among other things, provides software and services for managing sales compensation, sales quotas, sales objectives, and other sales processes." ZS's Answer to Second Am. Compl. at ¶ 10. Among ZS's clients are corporations in the "financial, pharmaceutical and biotech industries." Id. at ¶ 27.

In the fall of 2005, Novo was in the final months of an automatically-renewed one year contract term with Synygy for "outsourced services in the form of monthly data processing and reporting used in the administration of Novo's incentive compensation program for its sales force – often called 'IC administration' or 'IC operations.'" Defs.' Causation Mem. at 1. In October 2005, Novo informed Synygy that it would "not renew [its] contract automatically." Id. at 16. In December 2005, Novo's "manager of incentive compensation," Raja Selvanathan, id. at 9, emailed a final termination notice to Synygy in which he explained, inter alia, that Novo had located "an alternate provider that is better aligned with our long term plan and strategies" and would not renew its contract with Synygy. Id. at 16-17.

Novo transitioned its IC administration work to ZS from Synygy. Id. at 17. In or around October 2005, ZS and Novo entered into a three-year agreement for ZS to provide IC administration services for Novo. Pl.'s Causation Opp'n Mem. at 22. During the proposal process and the transition of IC administration work from Synygy to ZS, Novo provided ZS with

samples of IC reports that Synygy had delivered to Novo in prior years.  Defs.' Causation Mem. at 17.  Synygy contends that "Novo has stipulated that it disclosed incentive compensation reports designed by Synygy [to] ZS" and that "[t]his is also true with respect to the compensation simulators and software macros contained within those reports."  Pl.'s Trade Secret Opp'n Mem. at 38; see Pl.'s Ex. 57 (ZS Stipulation).  ZS has stipulated that it "received those materials from Novo in electronic native format."  Pl.'s Trade Secret Opp'n Mem. at 38.  Novo disclosed the materials in question to ZS "without the knowledge or consent of Synygy."  Id.

Certain documents or software files that Novo provided to ZS included notations marking the documents as confidential and/or subject to copyright by Synygy.  Pl.'s Causation Opp'n Mem. at 23.  Also, at least some of the information included in the disclosed reports was password protected.  See Pl.'s Trade Secret Opp'n Mem. 4, citing Pl.'s Ex. 13 ("there are two worksheet tabs in the Excel file:  a static page one (which conveys information to the sales representative in terms of how they were performed, (and is also password protected); and a dynamic page 2 compensation simulator, which enables the sales representatives to change variables and simulate how they would have performed if the variables changed.");  Pl.'s Trade Secret Opp'n Mem. at 15 ("the overwhelming majority of the files it sent to Novo were password protected.");  see also id. at 39 (same).  Synygy contends that "in order to access and use the Synygy reports ZS received from Novo, ZS was required to crack the Synygy passwords."  Id. at 15.  Defendants' expert, Cliff Ragsdale testified that to access information in a document that was password protected, ZS effectively had two options, first, to request the password from Synygy, something which ZS did not do, and second to break through the password using "an online program or a hexadecimal file editor."  Id. at 39, citing Ragsdale Dep. at 150:4-22.

Plaintiff contends that "as a mandatory prerequisite to receiving [the] custom reports and

other deliverables [that Synygy prepared for Novo], Novo was required to sign a confidentiality agreement in which it agreed not to disclose any of the documents, including, but not limited to the report designs, to any third parties." Pl.'s Trade Secret Opp'n Mem. at 3. Effective April 9, 1999, Synygy and Novo entered into an agreement entitled "Incentive Compensation Services Agreement." Defs.' State Law Mem. at 7, citing Defs.' Ex. 14 (Dep. Ex 72). In section 8 of the agreement, under the heading "Confidentiality," Synygy and Novo

> agree[d] not to divulge, disclose, convey or permit the disclosure of any of the Proprietary Information of the other, either verbally or in writing, to any person, corporation, or third party, other than employees, agents, subcontractors or independent contractors of Synygy or [Novo] and their parent corporations, subsidiaries, or affiliates who are engaged in performing this Agreement.

Defs.' Ex. 14 at SYN0000700. They further agreed

> to bind their employees, agents, subcontractors and independent contractors, individually, and their parent corporations, subsidiaries, and affiliates, which have access to the other party's Proprietary Information, to the same standard of confidentiality and nondisclosure contained [there]in, and additionally to prohibit them from using any Proprietary Information for any purpose other than for the purposes described in [the] Agreement.

Id. Proprietary Information is defined in the agreement as information "which may include but is not limited to (a) Synygy's Software Processes, Documents, Report Designs, and other confidential information and (b) [Novo's] data, business affairs, methods of operation, and other confidential information." Id. Documents are defined as "all documents created, in whole or in part, by Synygy, – except for those parts of documents which contain [Novo's] proprietary information." Id. at SYN0000699. Processes are defined as "the data processing, report design, and report creation processes and methodologies used by Synygy to complete the" incentive compensation services for Novo. Id. Report designs are defined as "the format, layout, structure and algorithms associated with all reports designed, in whole or in part, by Synygy, except for

those parts of report designs which contain [Novo's] proprietary information." <u>Id.</u> at

SYN0000699-700.

The parties agreed that:

Synygy is and shall be the sole and exclusive owner and author of:

(i) the system of software programs and documentation known as ADEPT used to process and manage data and to design, create and view reports (the "Software"),

(ii) the data processing, report design, and report creation processes and methodologies used by Synygy to complete the Services (the "Processes"),

(iii) all documents created, in whole or in part, by Synygy, – except for those parts of documents which contain [Novo's] proprietary information (the "Documents"), and

(iv) the format, layout, structure and algorithms associated with all reports designed, in whole or in part, by Synygy, except for those parts of report designs which contain Novo's proprietary information (the "Report Designs").

<u>Id.</u>  They further agreed that Novo "shall be the sole and exclusive owner of [Novo's] proprietary

information and nothing [in their agreement] shall be deemed to transfer to Synygy any right or

title to [Novo's] proprietary information." <u>Id.</u> at SYN0000700.  Novo also retained "the right to

copy and distribute all reports created for [Novo] by Synygy under th[eir] Agreement for the

purposes intended [there]in." <u>Id.</u>  The agreement also provided that

Synygy's rights of ownership with respect to the Software, Processes, Documents and Report designs include, but are not limited to, the exclusive right to make derivative works of the Software, Processes, Documents and Report Designs and to exploit such works commercially.  Synygy agrees that any derivative works made available commercially shall not include references to Client or its proprietary information.

<u>Id.</u>

I will consider each of the pending motions in turn.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id.

> To establish "that a fact cannot be or is genuinely disputed," a party must:
>
> > (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the

movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

## DISCUSSION

### I.   Causation

In their first motion for summary judgment, defendants seek summary judgment on all claims in Synygy's Second Amended Complaint "based on the failure of proof as to the essential element of causation and plaintiff Synygy, Inc.'s failure to demonstrate the existence of any genuine issues of material fact to the contrary."  Defs.' Causation Mot. at 1.  Defendants argue that "each of Synygy's 11 pending claims includes causation as an essential element, for which Synygy carries the burden of proof."  Defs.' Causation Mem. at 28.  They contend that "[t]he essential causation question at the heart of this case is whether there is any causal relationship between what Synygy claims to be copying and misuse of its 'intellectual property' and Novo's decision to switch IC administration to ZS at the end of 2005."  Id. at 29.  Defendants argue that "the evidence is overwhelming that Novo would have made the very same decision, based on the long track record of problems in the Synygy-Novo client relationship, Synygy's lack of effort to improve the situation, and Synygy's failure to support Novo's in-sourcing project."  Id.

In response, Synygy contends that defendants cannot prevail on summary judgment with their two "flawed arguments: 1) [that they] could steal Synygy's work product because Novo had an alleged bad relationship with Synygy; and 2) [that] Novo did not desire Synygy's work product."  Pl.'s Causation Opp'n Mem. at 27.  Synygy asserts that "[e]ven if Novo was so displeased with Synygy's services that it was compelled to terminate its contract with Synygy, that would not provide Novo with a license to steal and use Synygy's intellectual property."  Id. at 26.  Synygy argues that even if defendants could establish that Novo was displeased with

Synygy's services

> and therefore, was compelled to leave Synygy, . . . it is irrelevant.
> Novo was always free to terminate its contract with Synygy and
> ZS was always free to provide IC services.  What either of them
> was <u>never</u> free to do is engage in the wholesale misappropriation
> of Synygy's intellectual property – regardless of their putative
> justification.

<u>Id.</u>  Synygy also argues that it "can easily show the reasonable relationship between the

defendants' wrongful conduct and the direct revenues received from that conduct."  <u>Id.</u>

I find that defendants are off the mark with respect to their characterization of "[t]he

essential causation question at the heart of this case."  Defs.' Causation Mem. at 29.  With

respect to Synygy's non-copyright claims, what matters is not simply whether defendants'

alleged improper use of the materials prepared by Synygy caused Novo to switch IC

administration to ZS, but rather whether Synygy can show that ZS's and/or Novo's allegedly

wrongful use of Synygy's claimed proprietary information caused Synygy to suffer damages.

There is sufficient disagreement between the parties with respect to this question that I find that

material questions of fact remain on the issue of causation.

Further, to establish defendants' liability for copyright infringement, Synygy need only

prove: (1) Synygy's ownership of a valid copyright, and (2) the claimed infringers' copying of

protected elements of the copyrighted material.  <u>See Feist Publ'ns, Inc. v. Rural Telephone</u>

<u>Service Co., Inc.</u>, 499 U.S. 340, 361 (1991).  If defendants' liability is established, then what

matters for purposes of Synygy's copyright claim, which seeks an award based on defendants'

alleged profits resulting from their alleged infringement of Synygy's copyrights, is whether

Synygy can show that the profits that it seeks to recover are "'reasonably related to the [claimed]

infringement.'"  <u>William A. Graham Co. v. Haughey</u>, 568 F.3d 425, 443 (3d Cir. 2009), <u>quoting</u>

<u>On Davis v. Gap, Inc.</u>, 246 F.3d 152, 160 (2d Cir. 2001).  In <u>Graham</u>, the Court of Appeals found

that the plaintiff satisfied its burden with respect to causation by showing that customers of the defendant received sales proposals containing infringing language, "that the written proposals were important to [the defendants'] clients, that the infringed language . . . contributed to the success of those proposals, and that [the defendant] urged its employees to use the [infringed materials]." Graham, 568 F.3d at 443. Here, I find that there are material factual disputes with respect to whether defendants' allegedly infringing acts are reasonably related to Synygy's claimed lost profits. Specifically, Synygy has set forth facts that raise a question as to whether ZS and Novo's use of the allegedly infringed materials contributed to ZS's success in obtaining and retaining its contract with Novo. If proven at trial, the alleged repeated use and copying of software macros and/or reports derived from Synygy's copyrighted materials may establish that the content of Synygy's incentive compensation report designs was important to ZS and Novo and support Synygy's claims that the macros and/or reports had sufficient value to Novo and ZS such that defendants might be liable for Synygy's claimed lost profits.

Accordingly, I will deny defendants' motion for summary judgment on the issue of causation.

## II.    Trade Secrets

In their second motion for summary judgment, defendants seek summary judgment on Counts II and III of Synygy's Second Amended Complaint, which assert claims for misappropriation of trade secrets pursuant to New Jersey common law and the Pennsylvania Uniform Trade Secrets Act (PUTSA), 12 Pa. C.S.A. § 5301-5308.

In its response to defendants' motion, Synygy asserts that it

> has trade secrets in the specific incentive compensation reports and
> management reports it custom designed for Novo. Synygy has
> trade secrets that include all aspects of the design (including visual
> design as well as background design not visually apparent to the

> end user) of the following types of reports:  Incentive
> Compensation Reports . . . ; Preliminary Payout Factors
> Report . . . ; Parameter Verification Report . . . ; Roster
> Verification Report . . . ; Circle of Excellence Report . . . ;
> Earnings Summary-Nation Report . . . ; IC Report-Nation . . . .

Pl.'s Trade Secret Opp'n Mem. at 34.  Synygy's response identifies examples of each of the

types of reports identified.  Id.  Synygy contends that it "does not claim trade secret protection

over the Novo logos, trademarks or trade names that appear in the reports and were provided to

Synygy by Novo."  Id.  Instead, it claims that it has "trade secrets in all other aspects of the

design including the text, formatting, graphics, design, organization, calculations, formulas,

selection and arrangement of information."  Id. at 34-35.  Synygy contends that it "has trade

secrets in the use of ████████████████████████████████ an

interactive simulator, or 'what-if' calculator ████████████████

████ Id. at 35.  Synygy also claims it "has trade secrets in the software macro codes which

appeared with the Deliverables" and cites certain examples of the macro codes.  Id.

## A.   Specificity

The "starting point" in misappropriation cases is "whether, in fact, there is a trade secret

to be appropriated."  Van Prods. Co. v. Gen. Welding & Fabricating Co., 213 A.2d 769, 780 (Pa.

1965); see also Continental Data Sys., Inc. v. Exxon Corp., 638 F. Supp. 432, 442 (E.D. Pa.

1986) ("even wrongful appropriation is not actionable unless the information in question is a

trade secret").  To prevail on its trade secrets claims, Synygy first must

> show the existence of a trade secret with "reasonable degree of
> precision and specificity . . . such that a reasonable jury could find
> that plaintiff established each statutory element of a trade secret."
> This identification must be particular enough as to separate the
> trade secret from matters of general knowledge in the trade of or
> special knowledge of persons skilled in the trade.

Dow Chem. Canada Inc. v. HRD Corp., 909 F. Supp. 2d 340, 346 (D. Del. 2012); see also Sit-Up

Ltd. v. IAC/InterActiveCorp., No. 05-9292, 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008)

("[S]pecificity is required before the court so that the defendant can defend himself adequately

against claims of trade secret misappropriation, and can divine the line between secret and non-

secret information, and so that a jury can render a verdict based on a discriminating analysis of

the evidence of disclosure and misappropriation.").   Accordingly, in response to defendants'

motion to compel trade secrets discovery, I previously ordered "Synygy to serve defendants with

sworn supplemental answers to defendants' interrogatories setting forth with reasonable

particularity the trade secrets that Synygy claims were misappropriated." Synygy, Inc. v. ZS

Assocs., Inc., No. 07-3536, 2013 WL 3716518, at *5 (E.D. Pa. Jul. 15, 2013).   Defendants now

contend that summary judgment is warranted in their favor on Synygy's trade secrets claims

because Synygy "has failed to meet its burden of identifying the trade secrets with reasonable

particularity." Defs.' Trade Secret Mem. at 24.   In response, Synygy asserts the converse:  that it

has identified the confidential information that it claims defendants misappropriated.  Pl.'s Trade

Secret Opp'n Mem. at 41.

     In support of its argument that it has sufficiently identified its claimed trade secrets,

Synygy contends that its CEO, Mark Stiffler "repeatedly testified that the confidential

information of Synygy at issue in this case was the design of the reports Synygy did for Novo."

Id.  Stiffler testified that "the easiest way to think about it is that all of the information that

Synygy produces is Synygy confidential except for those pieces or values of data that belong to

the client." Pl.'s Ex. 12 (Stiffler Dep.) at 377:21-378:6.  Synygy also cites to the deposition

transcript of its corporate designee Jeff Evernham which "is over 300 pages long and goes into

the most minute detail about every aspect of the incentive compensation reports that are unique

and confidential to Synygy." Pl.'s Trade Secret Opp'n Mem. at 42, citing Pl.'s Ex. 10 (Synygy

Rule 30(b)(6) Dep. (Evernham)).[2] Synygy does not, however, identify any specific testimony by Evernham that identifies its purported trade secrets. Id. Instead, Synygy explains only that "Evernham's testimony includes things such as selection and placement of logos and names, products, and the use of fonts, among many elements." Id. Evernham testified that "[t]he report designs, . . . all the materials, all the elements and the combination of all of those elements together are confidential information." Pl.'s Ex. 10 (Synygy Rule 30(b)(6) Dep. (Evernham)) at 240:21-24. Thus broadly defined, I find that Stiffler and Evernham's references to all of Synygy's allegedly confidential information are not sufficient to define Synygy's claimed trade secrets. See IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 583-84 (7th Cir. 2001) (holding that "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition" of a trade secret and finding that "a 43 page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" was not sufficiently specific to show that the information in question was a trade secret); TNS Media Research, LLC v. TRA Global, Inc., 984 F. Supp. 2d 205, 238-39 (S.D.N.Y. 2013) (rejecting the plaintiff's "Dance of the Seven Veils approach to its trade secret claim" as "manifestly prejudicial and taxing to the Court" where "even though [the plaintiff] narrowed its list of trade secrets, it reserved the right to rely upon additional documents or testimony related to each trade secret"); qad. Inc. v. ALN Assocs., Inc., No. 88 C 2246, 1990 WL 93362, at *3 (N.D. Ill. June 20, 1990) (finding it "wrong as a matter of law" that a party could "simply persist in the blunderbuss statement that 'Everything you got from us was a trade secret'" and prevail on its trade secrets claim).

---

[2]      Evernham's designee deposition is found at both Plaintiff's Exhibit 10 and Defendant's Exhibit 53.

I decline, however, to grant summary judgment in favor of defendants solely based on the specificity of Synygy's designation of its trade secrets. In its first amended answer to ZS's first set of interrogatories, Synygy specifically claims trade secret protection over aspects of the design of its reports including:

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]





- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

Defs.' Ex. 65 (Synygy's 1st Am. Answer to 1st Set of Interrogs.) at 3-4. I find that this list, when combined with Synygy's claim in its response to defendants' motion that Synygy has "trade secrets that include all aspects of the design (including visual design as well as

background design not visually apparent to the end user)" with respect to a list of identified

examples of specific documents, Pl.'s Trade Secret Opp'n Mem at 34,[3] is sufficiently specific to

permit me to proceed to consider whether genuine issues of material fact remain regarding

Synygy's misappropriation claims.  See Do It Best Corp. v. Passport Software, Inc., No. 01-C-

7674, 2005 WL 743083, at *13 (N.D. Ill. Mar. 31, 2005) (denying summary judgment because

the plaintiff "did identify specific lines of code and specific software features" as its claimed

trade secrets even though the plaintiff came "dangerously close" to being too general to sustain

its trade secret claim where the plaintiff had explained that "to determine its trade secret, [the]

defendant need merely look at the lines of code which [the] plaintiff identified and examine the

design, structure and programming techniques and the integration into the code which [the

plaintiff] is using"); see also Olympus Managed Health Care, Inc. v. Am. Housecall Physicians,

Inc., 853 F. Supp. 2d 559, 572 (W.D.N.C. 2012) (finding that a list of "broad categories of trade

secrets" including "contract templates," "marketing materials," "product designs," "provided

services," and "financials" was sufficient to withstand summary judgment); see also Mike's

Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 411 (6th Cir. 2007) ("When materials . . . are

trade secrets based on a unique combination of both protected and unprotected material, a

plaintiff should not be obligated to identify which components of the protected material [are]

---

[3] As is noted above, in its response to defendants' motion, Synygy asserts that it
has trade secrets that include all aspects of the design (including
visual design as well as background design not visually apparent to
the end user) of the following types of reports:  Incentive
Compensation Reports . . . ; Preliminary Payout Factors
Report . . . ; Parameter Verification Report . . . ; Roster
Verification Report . . . ; Circle of Excellence Report . . . ;
Earnings Summary-Nation Report . . . ; IC Report-Nation . . . .

Pl.'s Trade Secret Opp'n Mem. at 34.  Synygy's response identifies specific examples of each of
the types of reports identified.  Id.

secret.").

Indeed, in their reply brief, defendants concede that Synygy's identification of "certain particular design features" including  . . . was indeed sufficiently specific to" permit consideration of "whether these design concepts were general knowledge or not." Defs.' Trade Secret Reply at 3-4.

I will also consider as sufficiently specific Synygy's claim that it "has trade secrets in the software macro codes which appeared with the Deliverables . . . ." Pl.'s Trade Secret Opp'n Mem. at 35. In particular, Synygy claims as trade secrets: (1) "the macro code identified in the Second Amended Complaint as Synygy Macros No. 1, which appeared within the Deliverables, for example within the December 2005 Circle of Excellence Report produced as SYN0075531;" and (2) "the macro code identified in the Complaint as Synygy Macros No. 2, which appeared in whole or in part, within the Deliverables . . . ." Defs.' Ex. 65 (Synygy's 1st Am. Answer to 1st Set of Interrogs.) at 2. Synygy has identified a number of examples of specific reports which contain Synygy Macros No. 2. Id.

Finally, I will consider as sufficiently specific Synygy's claim that it has trade secrets in its "custom designed compensation simulator" –  an interactive simulator, or 'what-if' calculator that Pl.'s Trade Secret Opp'n Mem. at 35.

## B.   Existence of a Trade Secret

The question of whether certain information constitutes a trade secret ordinarily is "best resolved by a fact finder after full presentation of evidence from each side," DSMC, Inc. v.

Convera Corp., No. 479 F. Supp. 2d 68, , 79 (D.D.C. 2007) (citations and quotations omitted);

see also Bro-Tech Corp. v. Thermax, Inc., 651 F. Supp. 2d 378, 410 (E.D. Pa. 2009) ("Whether

information qualifies for trade secret status is ordinarily a question of fact for the jury.").

"[A]lthough the issue is easily framed, the resolution is more difficult, for the law provides no

precise definition or litmus test of what constitutes a trade secret." Anaconda Co. v. Metric Tool

& Die Co., 485 F. Supp. 410, 421 (E.D. Pa. 1980). "A trade secret is one of the most elusive and

difficult concepts in the law to define." DSMC, Inc., 479 F. Supp. 2d at 79 (citations and

internal quotation omitted).  Under the PUTSA, a trade secret is defined as:

> Information, including a formula, drawing, pattern, compilation
> including a customer list, program, device, method technique or
> process that:
>
> (1) Derives independent economic value, actual or potential, from
> not being generally known to, and not being readily ascertainable
> by proper means by, other persons who can obtain economic value
> from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

12 Pa. C.S.A. § 5302.  "In New Jersey, a common law trade secret may consist of any formula,

pattern, device, or compilation of information that is used in business to obtain an advantage

over competitors who do not know or use it." Mu Sigma, Inc. v. Affine, Inc., No. 12-1323, 2013

WL 3772724, at *8 n.6 (D.N.J. July 17, 2013), citing Sun Dial Corp. v. Rideout, 16 N.J. 252,

257, 108 A.2d 442 (N.J. 1954) (further citations omitted).  "Determining whether the information

in question qualifies as a trade secret must be made on a case-by-case basis." Hill v. Best

Medical Int'l, Inc., Nos. 07-1709, 08-1404, 09-1194, 2011 WL 5082208, at *10 (W.D. Pa. Oct.

25, 2011) (citation omitted).  As is set forth below, "to the extent the Court can discern the

parameters of [Synygy's] trade secret claim[s] from the instant record," at least some of

Synygy's trade secrets claims must fail because not all of what Synygy has identified as its trade secrets can be found to constitute a trade secret. Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 265 (S.D.N.Y. Mar. 3, 2014).

### 1.    Secrecy

What is certain is that for something to qualify as a trade secret it must be secret. Rycoline Prods., Inc. v. Walsh, 756 A.2d 1047, 1052 (N.J. App. Civ. 2000); Youtie v. Macy's Retail Holding, Inc., 653 F. Supp. 612, 620 (E.D. Pa. 2009). "Secrecy is essentially a question of fact . . . . [N]o one factor is dispositive of whether [plaintiff] took reasonable precautions to protect its purported trade secrets." Merckle GmbH v. Johnson & Johnson, 961 F. Supp. 721, 731-32 (D.N.J. 1997) (citations omitted) (internal quotation marks omitted). "To be a trade secret, information must not be generally known in the wider business community or capable of being easily derived from public information." Fishkin v. Susquehanna Partners, G.P., 563 F. Supp. 2d 547, 582 (E.D. Pa. 2008) aff'd in part, 340 F. App'x 110 (3d Cir. 2009).

> The owner of a trade secret, unlike the owner of a patent, does not have a monopoly over the process or formula. He is only protected from other persons' gaining access to it either by stealing it directly from him, or having another to whom it was lawfully disclosed do so. Others in the field are free to arrive at precisely the same method and to use the method so long as they obtain their knowledge through their own independent efforts.

Continental Data Sys., Inc. v. Exxon Corp., 638 F. Supp. 432, 442 (E.D. Pa. 1986), quoting Greenberg v. Croydon Plastics, 378 F. Supp. 806, 812 (E.D. Pa. 1974).

### a.    Text, Graphics, Formatting, Design, Organization or Arrangement

Defendants argue that certain of the identified "design features [in Synygy's reports] are widely known and therefore they are not trade secrets." Defs.' Trade Secret Reply at 4. I agree. Many of the things which Synygy claims to be trade secrets are readily observable including the

text, formatting, graphics, design, organization and arrangement of the reports in question.  For

example, anyone who views one of the identified exemplar reports can easily observe ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ ) Defs.' Ex. 65 (Synygy's 1st Am. Answer to

1st Set of Interrogs.) at 3-4.  "'[T]hings that any user or passer-by sees at a glance are 'readily

ascertainable by proper means'" and cannot be trade secrets.  IDX Sys. Corp. v. Epic Sys. Corp.,

285 F.3d 581, 584 (7th Cir. 2002).  Accordingly, in IDX Systems, the Court of Appeals for the

Seventh Circuit affirmed the district court's grant of summary judgment in favor of the

defendants on the plaintiff's trade secret claims where "many of the items that appear[ed] in the

43-page description [of the plaintiff's claimed trade secrets], such as the appearance of data-entry

screens, [were] exceedingly hard to call trade secrets."  Id.  The Court explained that "[p]erhaps

screen displays could be copyrighted, but no copyright claim ha[d] been advanced, and a trade-

secret claim based on readily observable material is a bust."  Id.

Further, defendants have shown that many of the features which Synygy claims as its

trade secrets were disclosed to the public in a book authored by Synygy's CEO and owner, Mark

Stiffler, which was published in 2006.  Defs.' Ex. 66 (Stiffler Book).  "'[I]nformation that is

public knowledge or that is generally known in an industry cannot be a trade secret,' including

information that is available in publications."  Big Vision Private Ltd., 1 F. Supp. 3d at 270,

quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984) (further citations omitted).  In

Chapter 10 of his book, Stiffler explains the principles underlying Synygy's report design

methodology:

> Good incentive compensation reports show how performance is
> translated into some currency – whether it is money, gifts or other

> rewards.  They should clearly explain how the incentive
> compensation plan works and how results are calculated.  The
> reports should answer three basic questions:  (1) *What* did I make?
> (2) *How* was it calculated?  (3) *Why* did I make what I did?

Defs.' Ex. 66 (Stiffler Book) at 134 (emphasis in original).  He explains that when businesses

prepare an incentive compensation report they "are telling a story" and shouldn't "just show the

calculations," instead, they should

> show step-by-step the build up of how the data were used to create
> those calculations.  Creating visual consistency and visual links
> across sections will also help [employees] follow the story.  You
> might even want to include some "what-if" analyses to reinforce
> the relationship between compensation and performance. . . .

Id.  In Figure 11, Stiffler's book identifies list of 12 "design principles" to make incentive

compensation reports "more effective," including:

> 2.   To peel away the story of how the person is paid, major
>      sections of the report should appear in the following order
>      from top to bottom:  payment calculations, earnings
>      calculations (by component), and performance
>      measures. . . .
>
> 4.   The payment should be shown in a distinct box on the line
>      directly below the report banner typically in the upper-
>      right-hand corner of the report. . . .
>
> 6.   For every number used in the payment and earnings
>      calculations, there should be an area of the report that
>      shows how it was derived. . . .

Id. at 139.

   Also, in Figures 9 and 10 of his book, Stiffler includes examples of generic incentive

compensation reports.  Id. at 137-38.  The example reports clearly feature, inter alia, ███████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ The overlap between

the information disclosed in Stiffler's book and the report design elements identified as trade

secrets in Synygy's interrogatory response is clear.  Through Stiffler's book, Synygy "effectively

'freely disclosed' its information [about the effective individual components of an incentive

compensation report] to 'all comers' . . . ."  <u>Big Vision Private Ltd.</u>, 1 F. Supp. 3d at 269

  In further support of their argument that there has been public disclosure of the design

elements included in Synygy's incentive compensation reports, defendants note that Synygy

shared "similarly formatted generic Incentive Compensation Reports . . . as marketing

documents at public trade shows."  Defs.' Trade Secret Mem. at 27.  At his designee deposition,

Evernham explained that the generic reports were "clearly created for marketing purposes . . . ."

Defs.' Ex. 53 (Synygy Rule 30(b)(6) Dep. (Evernham)) at 153:15-153:7.  In particular,

defendants point to a "Sample Generic IC Report for Company ABC," Defs.' Ex. 74, which was

supplied in a business pitch to a company called Ventiv health.  <u>See</u> Defs.' Ex. 73 (Dan McDunn

email, Feb. 6, 2001).  In supplying the report to Ventiv, Synygy's marketing employee explained

that the report "demonstrates our basic incentive compensation reporting philosophy at the sales

rep level."  <u>Id.</u>  As with the sample reports included in Stiffler's book, the sample report provided

to Ventiv clearly features the design elements identified by Synygy as its trade secrets including

███████████████████████████████████████████

████████████████████████████████████████████

████████████

  On this record, no reasonable factfinder could find that [Synygy] undertook reasonable

efforts to maintain the secrecy of its alleged trade secret[s]" in the text, graphics, formatting,

design, organization or arrangement of its reports when they are considered standing alone. Big

Vision Private Ltd., 1 F. Supp. 3d at 269. Accordingly, I will grant defendants' motion for

summary judgment with respect to plaintiff's trade secret claims insofar as they relate

*individually* to the text or graphics included in or the formatting, design, organization or

arrangement of the types of reports identified by Synygy in its response to defendants' motion

(i.e., Incentive Compensation Reports, Preliminary Payout Factors Report, Parameter

Verification Report, Roster Verification Report, Circle of Excellence Report, Earnings

Summary-Nation Report, IC Report-Nation). See Pl.'s Trade Secret Opp'n Mem. at 34-35. My

finding with respect to the reports that Synygy specifically prepared for Novo *as they exist in

their entirety* is further set forth below.

### b.      Identified reports viewed in their entirety

Viewed in their entirety, it is appropriate to consider the identified reports as potential

combination trade secrets independent from Synygy's identified list of report design elements.

See Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC, No. 12-0864, 2014 WL 4055826, at

*12 (E.D. Pa. Aug. 15, 2014) (a "spreadsheet document . . . might qualify as a trade secret,

because it is a compilation that took time and effort to create"). Under the laws of Pennsylvania

and New Jersey, "even though each and every element of plaintiff's process is known to the

industry, the combination of those elements may be a trade secret if it produced a product

superior to that of competitors"). Rohm & Haas Co. v. Adco Chem. Co., 689 F.2d 424, 433 (3d

Cir. 1982); see also Synthes, Inc. v. Emerge Med., Inc., No. 11-1566, 2014 WL 2579286, at *72

(E.D. Pa. June 5, 2014) (finding manufacturing costs and usage data were "protectable trade

secret information" where "[t]he value of the information was in the compilation, categorization,

and organization of information on thousands of customers and products, which could not be

easily recreated by a competitor's mere talking with the customers"); Youtie, 653 F. Supp. 2d at

621–22 ("A compilation of data that has independent economic value can be protected as a trade

secret.").

As Evernham testified, Novo's logo "and the color blue that Novo Nordisk uses" are not

"Synygy confidential information, but their use in the presentation and in – . . . in the format [in

a particular document] and the totality of what's shown [in the document] for the purpose of

Novo Nordisk's incentive compensation report is Synygy confidential information." Defs.' Ex.

53 (Synygy Rule 30(b)(6) Dep. (Evernham)) at 243:6-17.  Evernham explained,

> [a]n individual design decision . . . by itself is not . . . going to have
> a dramatic impact on the overall value [of an incentive
> compensation report].  The design decision in the context of all of
> the other information that needs to be conveyed because th[e]
> distance [between text and a logo] is a function of the report and is
> a part of the total [and] is valuable to Synygy . . . .

Id. at 249:11-19.  Although there is evidence before me that Synygy publicly disclosed similar

reports including similar information that was formatted in a similar manner, I find that

defendants have not shown that there is no question of fact that the specific reports that Synygy

prepared for Novo were not known or readily ascertainable by proper means.  Cf. Giasson

Aerospace Sci., Inc. v. RCO Eng'g, Inc., 680 F. Supp. 2d 830, 841-42 (E.D. Mich. 2010)

("Plaintiffs need not show that each component of their trade secrets are secret, or even

nonobvious over what exists in the public domain. . . . . [A] trade secret can exist in combination

of characteristics each of which, by itself, is in the public domain.").

Further, I find that material questions of fact remain with respect to whether Synygy

undertook reasonable efforts to maintain the secrecy of the specifically identified types of

reports:  the Incentive Compensation Reports, Preliminary Payout Factors Report, Parameter

Verification Report, Roster Verification Report, Circle of Excellence Report, Earnings

Summary-Nation Report, and IC Report-Nation. As Synygy explains, "[e]ach employee is required to sign a confidentiality and non-competition agreement as a mandatory prerequisite to employment at Synygy." Pl.'s Trade Secret Opp'n Mem. at 14. Synygy also has internal security measures in place that "include restriction of access to confidential information to only those with a significant business need and password protections." Id. Information to be shared outside of Synygy is subject to a "written policy of marking the documents as "confidential" or copyrighted as necessary." Id. Under the facts presented, a reasonable jury could conclude that the secrecy element of the trade secret test has been met with respect to the reports.

### c.   Compensation Simulator

Synygy also claims trade secrets in its use of a "custom designed compensation simulator." Pl.'s Trade Secret Opp'n Mem. at 35. It explains that the reports it creates "often include a single-page incentive compensation report and a ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ 'what-if' calculator. This complex 'what-if' calculator enables sales reps. to simulate their compensation and calculate how certain variable factors can affect their compensation." Id. at 31-32. Defendants argue that Synygy's what-if calculators do not constitute trade secrets. Defs.' Trade Secret Reply at 6. I agree with defendants. On the record before me no reasonable factfinder could find that Synygy's what-if calculators are trade secrets.

First, in its response to defendants' motion, Synygy provides no support for its contention that it "has trade secrets in the use of ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ an interactive simulator, or 'what-if' calculator ▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Pl.'s Trade Secret Opp'n Mem. at 35. Merely because Synygy calls something a trade secret does not make it a trade secret. See Diodato v. Wells Fargo Ins. Servs., USA, Inc., No. 12-2454, 2014 WL 4411591, at *29 (M.D. Pa. Sept. 8, 2014) (granting

summary judgment where "Wells Fargo direct[ed] the court to no record evidence to prove its *ipse dixit* assertion that the information generally identified in its pleading constitute[d] a trade secret"); Bodemer v. Swanel Beverage, Inc., 884 F. Supp. 2d 717, 726 (N.D. Ind. 2012) (finding that "one person's subjective belief about the secrecy of a potential trade secret is [not] dispositive on the issue of trade secret protection").

Second, I am not persuaded that, without more, the use of passwords to protect worksheets containing what-if calculators is sufficient to show that the what-if calculators are trade secrets. At his deposition, Synygy's designee Thomas Hausch testified that "it was generally a practice to protect any report sheet with a what-if calculator so that end-users, specifically sales reps, didn't break them, just so they could only click on buttons and click in certain places where they were allowed to be in." Pl.'s Ex. 29 (Hausch Designee Dep.) at 126:17-21. Asked whether the password did anything "[o]her than protecting the report sheet from changes by the sales rep," Hausch responded "No. Well, it would have protected it from changes from anyone who didn't know the password, but . . . ." Id. 126:22-127:2. This testimony is not sufficient to support a conclusion that the primary intention behind password protection was to maintain the what-if calculators as confidential trade secrets and the use of passwords alone is thus not enough to make the calculators into trade secrets.

Finally, in his book Stiffler explained that in designing incentive compensation reports,

> [y]ou might even want to include some "what if" analyses to reinforce the relationship between compensation and performance (for example, had you sold 10 more units, your commission rate would have increased to 3%. Had you sold 15 more units, your commission rate would have increased to 3%. Had you sold 15 more units, etc.).

Defs.' Ex. 66 (Stiffler Book) at 135. The sample report included at Figure 9 in Stiffler's book clearly includes "what if" calculators. Id. at 137. Additionally, defendants point to the report

prepared by their expert who explains that "using an Excel worksheet as an interactive calculator and to create charts and graphs cannot possibly be regarded as a secret as this is precisely what Excel is designed to do." Pl.'s Ex. 34 (Ragsdale Report) at 66, ¶ 166. As defendants contend, "[t]he use of 'what if' calculators is so common within Microsoft's Excel[ ] that it is prominently featured in a drop-down menu." Defs.' Trade Secret Reply at 7. Cf. Fishkin, 563 F. Supp. 2d at 584 (noting that "[t]he spreadsheet itself was a publicly-available Microsoft Excel program" in support of its finding that a formula and spreadsheet used for futures trading were not trade secrets). Synygy's "what if" calculators are based on concepts that are "too widely known and too readily ascertainable to constitute trade secrets. At most, they constitute general secrets of the trade . . . ." Id. (quotation omitted).

I find that defendants are entitled to summary judgment on Synygy's trade secrets claim to the extent that it pertains to the use of compensation simulators/what-if calculators.

### d.    Software Macros

Synygy also contends that it "has trade secrets in the software macro codes which appeared with the Deliverables." Pl.'s Trade Secret Opp'n Mem. at 35. Defendants contend that the software macros are not trade secrets as "discovery has shown that large portions of the macros were written by Microsoft, contain publicly available ideas from user forums, and reflect Novo's plan design and therefore Novo's ideas, rather than Synygy's." Defs.' Trade Secret Mem. at 28. In response, Synygy explains that "[t]he specific function of every line of code was discussed in great detail in the deposition testimony of Thomas Hausch" and cites broadly to more than 70 pages of Hausch's deposition transcript. Pl.'s Trade Secret Opp'n Mem. at 35, citing Pl.'s Ex. 29 (Hausch Dep.) 72:1-144:25.

Defendants correctly contend that at least some portion of the relevant software macros

were created with the assistance of information obtained in online user forums.  Danesh

Sakhrani, a former Synygy employee, testified that:

> if I had a question about how to do something specific in Excel, a
> good – nine times out of ten , eight times out of ten, I find a similar
> question has already been posted and people, generally, will pose
> questions like those in a forum, so I go see what the question was,
> see what the answer was . . . .  I would look at how they did it,
> modify it to how it's applicable, made it nicer if I needed to and
> then implement it myself.

Defs.' Ex. 19 (Sakhrani Dep.) at 93:11-94:2.  And indeed, according to Sakhrani's testimony,

some portions of the relevant software macros were created using Record Macro:  "a function in

Excel that when you select it, whatever movements or whatever tasks you have Excel perform, it

will record that for you into the [Visual Basic for Applications programming language]."  Id. at

89:12-16; see, e.g., id. at 108:16-23 ("my best recollection of that general snippets of code was I

did use Record Macro definitely I used Record Macro to figure out how to do that but I

remember having to tweak it quite a bit to finally get it the way I wanted it to work, so that's why

I defined it as partially"); 113:17-21 ███████ ████

██████████████████████████████████████████████████████

███████████████████████ 119:2-5 ("the designation of the different series, I got that

designation from the macro, Record Macro, when the equation was what I built"); 120:17-23

("Yes, it's based off the Record Macro for the most part.  It is a repetition of something that was

done earlier in the report, so I could just – it wouldn't have been two separate Record Macro, but

it would have been based off of it initially.").

    However, consistent with Sakhrani's cited testimony the entirety of the macros were not

written using Record Macro.  See also Pl.'s Ex. 29 (Hausch Dep.) at 89:25-90:5 ("Q. So the idea

was Synygy's, but the expression was determined by Microsoft, correct? . . . THE WITNESS: As

far as I can tell on page 365, that's correct.  In no other portion of this exhibit is that correct.").

Further, even though Record Macro may have been used to capture some elements of the code

that makes up Synygy's macros, the Macros would not exist without Synygy's decisions

regarding the information that should be programmed into the creation of its IC reports.  Hausch

testified that

> Synygy's claiming that it authored all the code in [Synygy Macros
> No. 1].  Whether or not that code was handwritten or whether that
> code was captured through the Visual Basic editor's application to
> convert your keystrokes and mouse movements in individual basic
> language, somebody at Synygy still determined what the
> movement and the keystrokes ought to be that was then translated
> into the language – . . . And mouse movement and other functions
> ought to be.  So the process was still defined by Synygy, and the
> majority of the code behind that process was written by Synygy.
> And some elements of that code, as captured on page 365, only
> were recorded, but the concept was still defined and authored by
> Synygy.

Pl.'s Ex. 29 (Hausch Dep.) at 89:5-23.  Synygy's macros include at least some information that

cannot be determined by simply looking at Synygy's reports or online user forums or by using

Record Macro.  Hausch and Sakhrani's testimony raises an issue of material fact with respect to

whether the software macros are capable of being easily derived from public information.  Under

the facts presented, including evidence of Synygy's efforts to maintain confidentiality through

confidentiality and non-disclosure agreements,[4] a reasonable jury could conclude that the secrecy

---

[4]     Hausch testified that

> The two primary mechanisms that we use to keep Synygy software
> macros, among other things, secret are nondisclosure agreements
> with our client base through the services agreement and
> confidentiality agreements with every employee at Synygy as part
> of their employment acceptance.  I'm under one myself.  As part of
> the . . . employee confidentiality agreement, we're obligated not to
> disclose our client's information basically outside of the client
> team with, you know, some flexibility as we go up through the

element of the trade secret test has been met with respect to the software macros.

## 2.   Peculiar Importance and Competitive Value

Because I have found that questions of fact remain with respect to whether the identified reports in their entirety and/or the software macros were publicly known or readily accessible, I must proceed to consider whether a genuine dispute remains with respect to whether Synygy's identified reports or its software macros derive independent economic value from not being generally known. Defendants contend that summary judgment is warranted because "Synygy has failed to say how any of what it admits were *sui generis* reports reflecting Novo's plan design and containing Novo information could conceivably be of any value to Synygy in any other context." Defs.' Trade Secret Reply at 17 n.9. They argue that "custom designed materials that do not reflect any of a plaintiff's concepts or business rules but instead reflect those of the defendant/customer are not trade secrets because they cannot have 'peculiar importance to the plaintiff' and do not constitute processes or devices 'for continuous use in the operation' of the plaintiff's business." Id. (citation omitted). On the evidence now before me, I disagree.

### a.   Reports in Their Entirety

To withstand defendants' motion for summary judgment, Synygy must show that a question of fact remains as to whether its reports have independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use. "Certainly it is possible that a new combination of known steps or

> organization; but we don't talk to one client about -- you know, one client with another client or share the intimate details of one client with another client team at Synygy. The nondisclosure agreement with our clients prevents them from distributing our material outside of their organization. That is a standard part of our boilerplate services agreements with our client base.

Pl.'s Ex. 29 (Hausch Designee Dep.) at 194:25-195:20.

processes can be entitled to trade secret protection." <u>Arco Indus. Corp. v. Chemcast Corp.</u>, 633

F.2d 435, 442 (6th Cir. 1980). But to succeed, plaintiff must show "that the combination

achieved in its overall layout and approach [is] in [some] way novel," <u>id.</u>, or has value from not

being generally known. Accordingly, in <u>National Risk Management, Inc. v. Bramwell</u>, 819 F.

Supp. 417, 431-32 (E.D. Pa. 1993), the Court explained that "[t]he fact that individual forms in

marketing material or in [the] plaintiff's proposal book were compilations of public information

does not itself preclude a finding that the combination of the included elements affords a plaintiff

a competitive advantage and is not itself in the public domain."

> [T]he combination of information in [the plaintiff's] proposal book
> reflected market research performed by [the] plaintiff and
> decisions to include and exclude certain elements from a larger
> pool of data. It is this, rather than the Data contained in the
> individual forms generally known in the self insurance business,
> which may arguably contain a sufficient degree of novelty,
> however slight, to be excluded from general knowledge and may
> qualify the proposal book as a trade secret.

<u>Id.</u> at 432.

On the record before me, I find that whether the identified reports derive independent

economic value from not being generally known is a question of fact. Synygy's expert, Peter

Lee, when asked if "what[ is] valuable is the [incentive compensation] report as a whole,"

responded "[c]orrect. . . . I would say the thing of most value here is the report has a whole, yes."

Defs.' Ex. 47 (Lee Dep.) at 259:10-17. In his expert report, Lee, opines that, when compared to

incentive compensation reports prepared by other entities,

> the reports created by [Synygy], using their proprietary report
> design process, provided the clearest communication to an
> uneducated reader of incentive compensation plan details. These
> details were arranged at the top of the reports in a manner that
> enable readers to determine, without additional data and without
> reviewing data from multiple sources, how much their incentive
> payout would be and how the calculation was performed.

> This specific arrangement and design philosophy created a
> competitive advantage.  Because the [Synygy] reports
> communicated payment amounts and payment calculations quickly
> and efficiently to readers, this would have reduced the amount of
> time that readers/sales people would need to spend to determine
> whether they were being paid the right amount.

Defs.' Ex. 4 (Lee Report) at 23.

In contrast, defendants' expert, Tony Buglione, explains that other IC report "designs

referenced in Mr. Lee's report, as well as other designs available to Novo, are also effective, and

require no greater time to comprehend than does the design of Synygy's." Defs.' Ex. 8

(Buglione Report) at 58.  Buglione opines that "the payout number and other elements can be

located in various places on the report and still be effective.  This is just common sense:  Sales

reps quickly learn where to find the information that is most important to them."  Id. at 60-61.

In his rebuttal report, Lee writes "incremental improvements in effectiveness and

efficiency are critical.  Although it is possible to have any number of IC report layouts and

formats, the subtleties may be difficult to grasp for those whose primary experience with IC

reporting is as a recipient of reports rather than as a designer of reports." Defs.' Ex. 89 at 7.  Lee

contends that Synygy's reports provide "sales representative[s] with imperfect knowledge of

their IC plan" with "a much better chance of correctly deciphering" the information contained

therein.  Id. at 10.

Based on the conflicting testimony of the parties' experts, a jury could reasonably find

that Synygy's reports derive independent economic value from not being generally known.  Cf.,

Latuszewski v. Valic Fin. Advisors, Inc., No. 03–540, 2007 WL 4462739, at *17 (W.D. Pa. Dec.

19, 2007) ("The fact that the same information can be gathered on any one customer by talking

with the customer herself is irrelevant.  The value in [a company's] customer information is in

the compilation, categorization, and organization of information on thousands of customers, combined with the ability to search and format it into a readily usable form.  This is what a competitor does not have and cannot easily recreate."), aff'd, 393 F. App'x 962 (3d Cir.2010).

      **b.**      **Software Macros**

      Defendants argue that "the macros perform trivial functions, such as highlighting certain rows in a sales contest report for Novo Nordisk – something that is not only trivial, but useless other than in a particular Novo Report dating from 2005."  Defs.' Trade Secret Reply at 6.  They contend that the testimony of Thomas Lenox and Dhanesh Sakhrani, who are former Synygy employees, shows that the macros in question are so specific to the work Synygy performed for Novo that they would not have value for other Synygy clients.  Defs.' Trade Secret Mot. at 30; citing Defs.' Ex. 19 (Sakhrani Dep.) at 124:24-125:4 (agreeing that "macrocode was specifically designed . . . for particular reports being prepared for Novo"); Defs.' Ex. 32 (Lenox Dep.) at 171:10-172:9 ("no client has the same IC plan"), 242:1-11 ("Q. And is it the case that these macros are so specific . . . that it doesn't really make sense to borrow something from some other source? . . . [A.] In a lot of cases, you could say that, yeah.").  Defs.' Ex. 53 (Synygy Rule 30(b)(6) Dep. (Evernham)) at 289:18-23 (responding that there are no "instances where Synygy registered reports or parts thereof were used in connection with clients of Synygy other than Novo Nordisk").  But the macros would have value to Novo.  And competitors such as ZS, if given access to Synygy's software macros would be able to produce incentive compensation reports for Novo without expending the time and money required to develop proprietary software macros for the task.  See Ecolaire Inc. v. Crissman, 542 F. Supp. 196, 206 (E.D. Pa. 1982) (finding drawings might qualify as trade secrets where, "[a]bsent access to such drawings, competitors must resort to a costly, time consuming process of reverse engineering in order to

produce many of the parts described in the drawings."). Synygy's claim is that Novo and ZS misappropriated the macros for Novo's use. Am. Compl. ¶¶ 76-77. I find that a question of fact remains as to whether the software macros derive independent economic value from not being generally known.

### E.   Evidence of Misappropriation

Even if Synygy has trade secrets in the identified reports or the software macros, to withstand defendants' motion for summary judgment, Synygy must show that a genuine dispute remains as to whether defendants misappropriated its trade secrets. To prove misappropriation of a trade secret under the PUTSA, Synygy must establish that its trade secrets were disclosed or used without its consent and that defendants:

> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>
> > (A) derived from or through a person who had utilized improper means to acquire it;
> >
> > (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> >
> > (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. C.S.A. § 5302. See also Hill v. Best Medical Intern., Inc., Nos. 07-1709, 08-1404, 09-1194, 2011 WL 5082208, at *10 (W.D. Pa. Oct. 25, 2011), citing 12 Pa. C.S. § 5302 (finding that a misappropriation plaintiff "must show that the defendant used or disclosed information that it knew or had reason to know was a trade secret and that the defendant acquired such

information by improper means.").  Similarly,

> To prevail on a claim for misappropriation of trade secrets under
> New Jersey law, a party must establish: "(1) the existence of a
> trade secret; (2) communicated in confidence by the plaintiff to
> the employee; (3) disclosed by the employee in breach of that
> confidence; (4) acquired by the competitor with knowledge of the
> breach of confidence, and (5) used by the competitor to the
> detriment of the plaintiff."

Ameriprise Fin. Servs., Inc. v. Koenig, No 11-6140, 2012 WL 379940, at *6 (D.N.J. Feb. 6,

2012), quoting Merckle GmbH v. Johnson & Johnson, 961 F. Supp. 721, 730 (D.N.J. 1997);

Rycoline Prods., Inc. v. Walsh, 756 A.2d 1047, 1052 (N. J. Super. Ct. App. Div. 2000).

Defendants have stipulated that Novo sent certain of Synygy's reports to ZS.  See Pl.'s

Ex. 37 (Mulroney Dep.) at 161:11-163:5; Pl.'s Ex. 57 (ZS Stipulation).  The question is whether,

in doing so, Novo improperly disclosed the information or ZS improperly acquired the

information.[5]

### 1.    Novo

Novo argues that it "acquired all the reports quite properly" and, as a result, cannot be

held liable for misappropriation of Synygy's trade secrets.  Defs.' Trade Secret Reply at 10.  But

if Novo disclosed Synygy's trade secrets to ZS and, "at the time of disclosure . . . knew or had

reason to know that [its] knowledge of the trade secret was . . . acquired under circumstances

giving rise to a duty to maintain its secrecy or limit its use," Synygy can prevail on its trade

secrets claim against Novo.  "Improper means" is defined under the PUTSA as including "breach

or inducement of a duty to maintain secrecy."  12 Pa. C.S.A. § 5302.  Thus "a claim for trade

secret misappropriation may . . . be premised on the defendant's disclosure of a trade secret in

---

[5]    Defendants' argument that Synygy cannot show misappropriation because it has
not proven that a trade secret exists is unavailing for the reasons set forth in my above
discussion.

violation of a duty of secrecy." <u>Wentworth-Douglass Hosp. v. Young & Novis Prof'l Ass'n</u>, 10-CV-120-SM, 2012 WL 1081172, at *5 (D.N.H. Mar. 30, 2012) (applying parallel provision in the New Hampshire Uniform Trade Secrets Act).

Synygy contends that "[t]he evidence in this case is unequivocal in that Novo was only permitted to receive the incentive compensation reports designed by Synygy under the strict confidentiality protections contained in the Synygy-Novo Agreement." Pl.'s Trade Secret Mem. at 37. Under the terms of the agreement, Novo "agree[d] not to divulge, disclose, convey or permit the disclosure of any of the Proprietary Information of [Synygy], either verbally or in writing, to any person, corporation, or third party, other than employees, agents, subcontractors or independent contractors of Synygy or [Novo] and their parent corporations, subsidiaries or affiliates who are engaged in performing this Agreement." Pl.'s Ex. 33 at SYN00035. Prior to finalizing its contract with Novo, Synygy explained to Novo that its "intent [in making certain modifications to the contract] is to protect our intellectual property. For that reason we state ownership of documents that we create and design. This prevents our work from being copied and is very important to us." Pl.'s Ex. 26 (Email re: Comments on Draft Incentive Compensation Services Agreement, March 23, 1999) at SYN0109537.

Defendants counter that "the summary judgment record does not support a reasonable conclusion that Novo disclosed any 'Proprietary Information' under its contract with Synygy." Defs.' Trade Secret Mem. at 32. They argue that "Novo reasonably believed its reports were its reports" and "there is no evidence that Novo was put on notice by Synygy that whatever Synygy now contends are its trade secrets were trade secrets." <u>Id.</u> at 32-33. Defendants contend that "any argument that Novo 'should have known' that Synygy was somehow claiming that something in these thousands of reports was its 'trade secret[ ]' [is] unreasonable as a matter of

law." Id. at 32.  They also argue that no dispute of fact remains with respect Novo's non-liability

for misappropriation because Synygy did not follow its own policy on marking any of the

documents or software in question "Synygy Confidential" and claim that because Synygy did not

"put Novo . . . on notice that Synygy believed any of its trade secrets were in [the reports

provided to Novo], it cannot be reasonably concluded that Novo . . . [was] aware of any breaches

of confidences." Id. at 35.

On the record before me, plaintiff can withstand defendant's motion for summary

judgment on its claim for misappropriation of trade secrets against Novo.  Material questions of

fact remain with respect to whether Novo was aware that the information it shared with ZS

included confidential trade secrets.  As a result, material questions of fact also remain with

respect to the question of whether Novo violated the PUTSA or breached a confidence under

New Jersey law when it disclosed the Synygy-prepared reports and software macros to ZS.

Accordingly, I will deny defendants' request for summary judgment on Synygy's PUTSA claim

against Novo insofar as it pertains to the reports and the software macros.

### 2.    ZS

I am likewise satisfied that the question of whether ZS misappropriated any of Synygy's

trade secrets must be left to the jury given the issues of disputed fact that remain with respect to

whether ZS had reason to know that any of the information that Novo shared with it was

"derived from or through a person who owed a duty to [Synygy] to maintain its secrecy," 12 Pa.

C.S.A. § 5302, or, in other words, that it was "acquired by [ZS] with knowledge of [a] breach of

confidence." Ameriprise Fin. Servs., 2012 WL 379940, at *6.

Defendants argue that "Synygy can point to no evidence in the record that ZS knew or

had a reason to know that whatever it is that Synygy now claims is its trade secret was acquired

by improper means by Novo." Defs.' Trade Secret Mot. at 33.  Synygy counters that "ZS was aware of Synygy's contractual relationship with Novo and that Synygy was a direct competitor who was aggressive about protecting its intellectual property rights." Pl.'s Trade Secret Opp'n Mem. at 38.  Synygy also asserts that it "took the extra step of ensuring that the overwhelming majority of the files it sent to Novo were password protected," and despite the presence of passwords, "ZS simply and unlawfully hacked the Synygy passwords." Pl.'s Trade Secret Opp'n Mem. at 39.

Defendants argue that "review of the various reports Synygy . . . asserts are representative samples of Novo deliverables . . . clearly show that Synygy did not use passwords to protect anything it is now arguing constitute its 'trade secrets.'" Defs.' Trade Secret Reply at 14.  Defendants contend that "Synygy failed to use any passwords to protect the macros in the Incentive Compensation report . . . .  Nor were the macros protected in the Circle of Excellence Report, Parameter Verification Report and Earnings Summary-Nation Report . . . which were management-level reports of limited distribution." Defs.' Trade Secret Reply at 15.  They contend that "Synygy's only argument is that one ZS employee provided instructions to another ZS employee about how to use a publicly-available tool to unlock one password-protected sheet in one report." Defs.' Trade Secret Reply at 14.  Defendants maintain that "no reasonable jury could find that ZS should have understood that password protection of one worksheet of Novo data in one workbook meant that Synygy was trying to protect something not found in that one worksheet . . . ." Defs.' Trade Secret Reply at 17 (emphasis omitted).  I disagree.

Construing the record in favor of Synygy as the non-movant, I find that there is sufficient evidence to raise material questions of fact with respect to whether ZS had knowledge that the reports and software macros were acquired from Novo in violation of any duty Novo owed to

Synygy to maintain the secrecy of the information in question.  There is evidence that ZS removed information associated with Synygy from documents it intended to use as its own.  See Pl.'s Ex. 69 (Neeraj Vashisht email, Dec. 13, 2005) ("Please check the File>Properties>Summary Tab to ensure that we have no references of Synygy/any other company than ZS."); Pl.'s Ex. 22 (Lee Report) at 3 ("A comparison of SYNYGY reports and report templates with ZS reports and report templates for NOVO reveals a strong derivative relationship between the reports generated by ZS and SYNYGY for NOVO and the templates used to generate those reports.").  At least some of the information that Novo provided to Synygy was protected by passwords.  See, e.g., Pl.'s Ex. 34 (Ragsdale Report Report) at 52-54 (report of defendants' expert analyzing password protection for various documents and identifying numerous documents with password protected software macros).  There is also evidence that ZS undertook efforts to "unprotect" password protected files.  See Pl.'s Ex. 35 (Sandeep Upadhyay email, Nov. 25, 2005) (providing instructions regarding removal of password protection and explaining that "it takes around 2-3 minutes for the sheet to get unprotected").  Thus I will deny defendants' request for summary judgment on Synygy's misappropriation claims against ZS insofar as it pertains to the reports and the software macros.

## III.   Copyright

In their third motion for summary judgment, defendants seek summary judgment on Count I of Synygy's second amended complaint, which asserts a claim against defendants for copyright infringement.  Synygy claims that defendants have infringed its copyrights in Synygy Macros No. 1 and No. 2.  See Second Am. Compl. ¶¶ 38, 94.  Synygy also claims that defendants have infringed its copyrights in Synygy Reports No. 1.  See Id. at ¶¶ 38, 94.

Effective October 14, 2008, Synygy received a certificate of copyright registration for

Synygy Macros No. 1. Pl.'s Ex. 74. Synygy also received a certificate of copyright registration

for Synygy Macros No. 2 effective June 8, 2009. Pl.'s Ex. 75. Synygy Macros No. 1 and No. 2

are "an original set of proprietary software macros to be used with an off-the-shelf software

program (Microsoft Excel) to generate analyses of sales compensation and sales performance of

pharmaceutical sales people."[6] See Second Am. Compl. ¶¶ 38, 94

Effective June 29, 2009,[7] Synygy also registered with the Copyright Office a collection

of reports called "Synygy Reports No. 1." Pl.'s Ex. 63. Synygy Reports No. 1 is a collection of

two categories of documents that Synygy custom designed and delivered to Novo during their

business relationship from 1999 to 2005. Pl.'s Copyright Opp'n Mem. at 3. The first are

incentive compensation report scorecards which "tell[ ] the pharmaceutical sales rep how he or

she is measuring up against the sales goals set by Novo." Defs.' Copyright Mem. at 4.

"[S]corecards were distributed to Novo's sales force monthly via email, and they showed how

much the rep could expect to make for a particular POA and how Novo had computed the rep's

payout." Id. at 4-5. The second category of documents in Synygy Reports No. 1 are "intended

for sales operations management at company headquarters, not for individual sales reps in the

field." Id. at 5. Defendants refer to these documents as "home office reports." Id. Plaintiff

refers to these documents as "management reports." Pl.'s Copyright Opp'n Mem. at 3.

"[M]anagement reports . . . communicate information to management regarding data

---

[6]       In its Second Amended Complaint, Synygy also claims that it has received
copyright registration numbers for the following software products: "ADEPT Viewer," "ADEPT
4.1 Viewer," IC Viewer 7.1; IC Expert 8.0" and "IC Viewer 8.1." Second Am. Compl. ¶ 73.
However, Synygy's Second Amended Complaint does not allege that ZS or Novo have infringed
Synygy's copyrights in these software products. See id. at ¶ 94 (asserting a claim for
infringement of "Synygy's copyrights in the Synygy Software Macros and the Synygy Reports,"
and not the "Synygy Software Products" or "Synygy Software").
[7]       Synygy registered and deposited Synygy Reports No. 1 with the Copyright office
two months before amending its complaint to assert a claim for copyright infringement. See
Defs.' Copyright Mem. at 9.

verifications, earnings summaries, and rankings of employees for sales contests." Id.

Specifically, the reports in Synygy Reports No. 1, the collection deposited with the Copyright Office, are identified as "Incentive Compensation Report" scorecards for DC, Maine, Nation (DCS, DBM, RBD), Regional Business Director and Mid Atlantic" and "Verification Report – Parameters," "Verification Report – Payout Factor Tables," "Roster Verification Report – Comparison of Current and Previous Territory/Role/EmpID Combinations," "Roster Verification Report – Comparison of Current and Previous Eligibility," "Roster Verification Report – Comparison of Current and Previous Names and Email Addresses," "COE Measures & Rankings by POA – Based on COE 2005 Criteria," "Circle of Excellence Ranking Report (As of Dec 2005 YTD)," Earnings Summary – Nation," "Circle of Excellence Ranking Report" and "Preliminary Payout Factor Report." See Pl.'s Ex. 64.  Synygy explains that before it deposited these reports \"with the Copyright Office, Synygy modified data values from the reports, in order to protect the confidentiality of the data that Novo licensed from a third party data aggregator . . . , modified Novo employee ID numbers, and replaced names of Novo employees with 'Lastname, Firstname.'" Pl.'s Copyright Opp'n Mem. at 4.

Synygy claims that "[b]y reproducing, distributing, and using copies of the Synygy Software Macros, the Synygy Reports, and other Confidential Information and creating derivative works therefrom, ZS and Novo have infringed and will continue to infringe Synygy's copyrights in the Synygy Software Macros and the Synygy Reports." Dkt. No. 85, at ¶ 94.  To prevail on its claim for copyright infringement, Synygy must show that it had ownership of a valid copyright and that defendants engaged in unauthorized copying of original elements of the copyrighted work.  See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 203 (3d Cir. 2005); Dam Things from Denmark,