IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SYNYGY, INC. | : | CIVIL ACTION |
| | : | No. 07-3536 |
| v. | : | |
| | : | |
| ZS ASSOCIATES, INC., et al. | : | |

---

| | | |
|---|---|---|
| ZS ASSOCIATES, INC., et al. | : | CIVIL ACTION |
| | : | No. 10-4274 |
| v. | : | |
| | : | |
| SYNYGY, INC. | : | |

O'NEILL, J.                                        July 30, 2015

### MEMORANDUM

Now before me is a summary judgment motion by plaintiff/counterclaim defendant
Synygy, Inc. (Dkt. Nos. 37 and 38 in Civ. A. No. 10-4274)[1], the response of
defendants/counterclaim plaintiffs ZS Associates, Inc. and ZS Associates International, Inc.
(collectively, ZS) (Dkt. No. 39 in Civ. A. No. 10-4274) and Synygy's reply (Dkt. No. 40 in Civ.
A. No. 10-4274).[2]  For the reasons that follow, I will grant Synygy's motion in part and will deny
it in part.

### BACKGROUND

Synygy and ZS are competitors in the marketplace for incentive compensation or "IC"
services.  See Synygy Mem. at 8.  In 2007, Synygy filed a seven count complaint in this Court

---

[1]      By my Order of May 23, 2011, I consolidated for all purposes the case docketed
at Civil Action No. 10-4274 with the case docketed at Civil Action No. 07-3536.  See Civ. A.
No. 1042-74 at Dkt. No. 15.  Synygy filed the instant motion in the case docketed at Civil Action
No. 10-4274, but not in the case docketed at Civil Action No. 07-3536.

[2]      Synygy's reply brief is also docketed in Case No. 07-3536 at Dkt. No. 196.

against ZS Associates, Inc.  See Synygy v. ZS Assocs., Inc., No. 07-3536 at Dkt. No. 1 (E.D. Pa.).  Synygy amended that complaint on August 5, 2009 by adding ten counts to the original seven and by naming ZS Associates International, Inc. and Novo Nordisk as additional defendants.  See id. at Dkt. No. 38 (E.D. Pa.).  The amended complaint, for the first time, raised a theory of copyright infringement.[3]  ZS Opp'n, Ex. 1, Dep. Ex. 70 at ¶¶ 1, 113-117.

One day before Synygy amended its complaint, on August 4, 2009, Synygy CEO Mark Stiffler emailed two members of his marketing staff about putting out a press release.  In his email, he explained that "[t]he goal . . . is to get our prospects and clients to have pity on us and to believe that we are right and ZS is wrong."  ZS Opp'n, Ex. 1, Dep. Ex. 70.  Stiffler instructed his marketing staff to "[w]ait til suit is actually filed" before publishing the press release.  ZS Opp'n, Ex. 24, Dep. Ex. 71; Ex. 18 (Stiffler Tr.) at 282:18-283:4.  On August 6, 2009, Synygy released the following press release:

> *Synygy Files Suit Against ZS Associates for Copyright*
> *Infringement and Misappropriation of Intellectual Property*
>
> Chester, Pa., August 6, 2009 – Synygy Inc., the largest and most
> experienced provider of sales performance management (SPM)
> solutions, today announced it has filed a lawsuit against ZS
> Associates of Evanston, IL, alleging copyright infringement,
> misappropriation of intellectual property, and theft of trade secrets.
>
> The complaint, filed in the District Court of Eastern Pennsylvania,
> alleges that ZS Associates and its affiliate, ZS Associates
> International, knowingly and improperly copied and
> misappropriated components of Synygy's sales compensation
> software and other intellectual property, and in addition,
> intentionally hired former Synygy employees, despite knowing
> about the existence of their non-compete agreements with Synygy,
> to gain access to confidential information acquired during their

---

[3]     The factual background underlying Synygy's claims against ZS and Novo is set forth in further detail in the Court's March 3, 2015 memorandum opinion in this litigation.  See Synygy, Inc. v. ZS Assocs., Inc., No. 07-3536, 2015 WL 899408 (E.D. Pa. Mar. 3, 2015).  I will set forth in this opinion facts relevant to the claims here at issue.

tenure with Synygy.

Synygy seeks relief including:

- judgment that ZS infringed Synygy's copyrights

- injunction that prohibits ZS from continued use of Synygy's software and other intellectual property

- injunction from luring and/or hiring employees of Synygy or its affiliates

- judgment for actual and compensatory damages for loss of revenue, profit, and company valuation

- punitive damages for acts of willful infringement

"Synygy created the market for sales compensation management (SCH) software and services more than 18 years ago," said Mark A. Stiffler, Synygy president and CEO. "We have invested many years and a lot of money in product development, which led to Synygy creating the SCM software that has propelled our success year after year. Our intellectual property is a very valuable asset and we are firmly committed to protecting it," he said.

"The lawsuit we filed today contends that ZS knowingly copied our software and other confidential information with the intent to use our intellectual property in direct competition with us. Our position is that ZS continues to use our software and other confidential information, causing us to lose substantial revenue, profit, and company valuation, while they profit from its use," continued Stiffler. "There is no way we can fully recover what we have lost from what we contend was deliberate and malicious misconduct, but we urge the Court to restrain ZS from continuing to infringe on our intellectual property and to award Synygy damages as the Court deems appropriate."

About Synygy

Synygy is the largest and most experienced provider of sales performance management (SPM) software and services. Synygy's SPM solutions include: sales compensation (incentive compensation, rewards and recognition, and total compensation); sales communications (web portals, reports and dashboards, and analytics, alerts, and answers); sales goals (territories and channels, forecasting and pipeline analysis, and objectives and quotas); and

> sales processes (reviews, recruiting and training, data repository
> and data processes, and workflow processes).  Based in Chester,
> Pennsylvania, with extensive operations in Europe and Asia,
> Synygy has achieved 18 continuous years of success.
> www.synygy.com

Synygy Mot., Ex. D.  The Synygy press release was republished its entirety on websites

including those belonging to Reuters, Yahoo Finance and Intellectual Property Today.  Synygy

Mot., Ex. G, at ¶ 21.

On August 8, 2009, ZS Associates issued its own press release in which it disclaimed

Synygy's assertions.  Synygy Mot., Ex. E.  ZS' press release explained that Synygy's "amended

complaint alleges that ZS Associates and its affiliate, ZS Associates International, Inc., as well as

the pharmaceutical client, copied and misappropriated components of Synygy's sales

compensation software and other intellectual property."  Id.  It then explained that "[i]t is ZS

Associates' firm conviction that Synygy's original allegations had no merit and that Synygy's

new allegations are baseless as well.  The company will continue to work through the appropriate

legal channels to defend its people, products and reputation."  Id.  Under the direction of Daniel

Peterson, ZS' managing principal for operations, the ZS press release was prepared by Reynolds

Communication Group, ZS' public-relations firm, for a cost of $5,101.  ZS' Opp'n Ex. 29

(Peterson Dep.) at 247:19-248:20; ZS' Opp'n Ex. 30 at ZSA00418492.

ZS claims that when the Synygy press release was issued, it was competing to obtain a

contract with ▮▮▮▮ for an IC administration project.  ZS Opp'n at 20.  On August 7, 2009,[4]

---

[4]    According to ZS' interrogatory responses, also "[o]n August 7, 2009, Craig
Stinebaugh . . . received a call from a client, ▮▮▮▮▮▮▮▮▮▮▮ (now
▮▮▮▮▮▮▮▮▮▮), who had received a Google Alert relating to the Synygy August
6, 2009 press release."  Synygy Mot. Ex. H. at p. 5.  However, ZS' response to Synygy's motion
for summary judgment does not mention this phone call or otherwise discuss any impact that the
Synygy press release may have had on ▮▮▮.  As of March 2013, ▮▮▮▮ was still a client of
ZS, although not for IC administration services.  Synygy Ex. I (Redden Tr.) at 87:8-16.

Samrat Shenbaga, a ZS employee and its main point of contact with ████████, reported that ████████, his "client at ████████ mentioned an email sent by [a competitor of ZS] that included the [press release] and inquired whether ████████ would like to start developing backup plans." ZS' Opp'n. Ex. 27 at ZSA000391854. Shenbaga testified that the Synygy press release

> led to certain discussions during the time when – we had gone
> through a very exhaustive selling process, and ████████ had gone
> through a very exhaustive evaluation process, who they were going
> to work with for IC operations, and it led to many more
> discussions between ZS and ████████ to convince them that we
> would be able to deliver the work. So it did create a certain
> amount of discomfort with the client that we had to resolve.

ZS' Opp'n Ex. 26 (Shenbaga Dep.) at 81:8-13. Asked about "the reputational effect caused by th[e Synygy] press release," id. at 78:21-23, Shenbaga testified that any concerns that he knew of were confined to ████████ expressed concern "regarding the ability of ZS' software and whether there was an issue with the way [ZS] had built it and the way [ZS] would be able to deploy it." Id. at 79:9-80:10. Despite any concern ████████ may have had, Shenbaga also testified that after ████████ asked ZS to "think about assurances that [ZS] could provide in the event that [ZS'] Javelin software would not be available to perform incentives administration work for ████████," id. at 47:23-48:1, ████████ signed a contract with ZS within "a month or two." Id. at 51:23-52:9. Shenbaga testified that ZS "had to include language in its contract that specified that in the event that the Javelin software became unavailable that [ZS] would still have other systems as backup systems available that could continue to run the ████████ processes without any interruption in services." Id. at 48:14-19. With this contractual language in place, the contract ████████ signed in September 2009 was renewed for three more years in 2012. Synygy Ex. J (Shenbaga Dep.) at 37:13-17. Shenbaga also testified that ZS's revenue from IC administration work for ████████ increased twenty percent between 2009 and July 2013, in part

-5-

due to "the addition of new divisions within their pharma division unit." Id. at 37:23-39:21.

In or around August 2007, ZS was also engaged in a sales process with ▆▆▆▆ for IC administration services in Germany, Italy and Spain. Synygy Mot. Ex. I (Redden Dep.) at 68:11-69:10. Sometime after the Synygy press release was issued, ▆▆▆▆▆▆▆▆ of ▆▆▆▆ contacted ZS principal Stephen Redden regarding the Synygy press release and "[h]e was concerned, [so he] asked [Redden] in one of [their] telephone calls to provide him with more details." ZS Opp'n, Ex. 16 (Redden Tr.) at 70:2-71:3. According to Redden, ▆▆▆▆ "didn't state any specific concern, just said he was concerned and he wanted to . . . have the background so he wouldn't be concerned anymore." Id. at 71:6-10. Redden responded to ▆▆▆▆'s concern in an August 19, 2009 email, in which he directed ▆▆▆▆ to ZS's press release as "additional information." ZS Opp'n, Ex. 32, Dep. Ex. SYN-6. Redden did not recall having any additional contact with ▆▆▆▆ about the Synygy press release, and although he testified that someone at ▆▆▆▆ other than ▆▆▆▆ raised an issue about the Synygy press release, he could not recall the person's name. ZS Opp'n, Ex. 16 (Redden Tr.) at 71:23-72:23.

Despite ▆▆▆▆'s expression of concern, Redden testified that ZS entered into contracts to provide IC administration services to ▆▆▆▆ in Germany in 2009, Synygy Ex. I (Redden Tr.) at 74:19-75:4, and in Italy. Id. at 75:21-77:6 (not recalling exact date). ZS continues to provide IC administration technology to ▆▆▆▆ in both countries as of March, 2013. Id. at 75:5-9; 77:8-11. Redden testified that ZS never entered into a contract with ▆▆▆▆ in Spain, but also testified that he was never told that the Synygy press release was the reason why ▆▆▆▆ in Spain declined to pursue a contract with ZS for IC administration services. Id. at 78:4-17.

On November 20, 2009, with the Synygy press release still available on Synygy's
website, Daniel B. Peterson, ZS's managing principal, wrote a letter to Synygy asking "that
Synygy promptly remove from its website the press release regarding Synygy's lawsuit against
ZS." Synygy Mot., Ex. F. Peterson elaborated that "[t]he press release is false and defamatory,
and is causing harm to ZS." Id.

On August 20, 2010, ZS and ZSAI filed suit against Synygy, claiming that the Synygy
press release was defamatory, ZS Compl. (Dkt. No. 1 in Civ. A. 10-4274) ¶¶ 15-41,
commercially disparaging, id. ¶¶ 42-49, and in violation of the Lanham Act. Id. ¶¶ 50-58; see
also ZS' Answer and Countercls. to Synygy's Second Am. Compl. (Dkt. No. 91 in Civ. A. No.
07-3536) (filed on May 23, 2011 and asserting counterclaims for defamation, commercial
disparagement and a Lanham Act violation). In support of its claims, ZS has engaged an expert
witness, Dr. Richard Gering, whose report concludes that "due to the alleged actions of
[Synygy], ZS suffered economic damages in the form of internal costs of ZS' personnel and fees
paid to Reynolds." ZS' Opp'n Ex. 2 (Gering Rpt.) at 12. Gering "aggregated the dollar value of
all of the time and expenses" of the six ZS personnel – Bajaj, Nimgoankar, Peterson, Redden,
Shenbaga and Stinebaugh – who it claims spent time in responding to the Synygy press release,
and the amounts paid to Reynolds for its work on the ZS press release. ZS' Opp'n Mem. at 21-
22. Gering calculated that ZS has $76,753 in damages for its claims against Synygy. ZS' Opp'n
Ex. 2 (Gering Rpt.) at 13. [5]

---

[5]    After ZS filed its motion for summary judgment, ZS and Novo sought leave to
serve a substitute expert report in lieu of Gering's report. See Dkt. No. 203. I am issuing an
order and opinion granting their motion for substitution simultaneous with this decision. My
decision to permit substitution does not change my conclusions here because, as defendants have
themselves requested, any new expert report will be "limited to the subject matter and theories
already espoused" in Gering's expert report. Dkt. No. 203 at ECF p. 11. Any new expert will
not be permitted to opine that ZS has suffered damages other than those set forth in Gering's

Synygy now seeks summary judgment in its favor on ZS' claims.

## STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23. If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. A fact is "material" if it might affect the outcome of the case under governing law. Id.

> To establish "that a fact cannot be or is genuinely disputed," a party must:
>
>> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W.

_____

report – i.e., ZS' remediation costs.

Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact

should be ascertained by resolving all inferences, doubts and issues of credibility against" the

movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation

marks omitted).

## DISCUSSION

Synygy contends that summary judgment is warranted in its favor because there is "no

evidence that business relations between ZS and outside entities suffered as a result of the

August 6, 2009 Press Release."  Synygy Mot. at ¶ 28.  Synygy also contends that

> [t]here has been no evidence produced by ZS that any pecuniary
> loss or any reduction in sales has occurred as a result of" the Press
> Release.  Id. ¶ 29.  Specifically, Synygy asserts that "[i]t is
> undisputed . . . that:  (1) ZS' revenue from ███████ has increased
> approximately thirty percent (15-30%) [sic] since 2009 across
> various service sectors, with increased work/revenue/projects
> through the present; (2) ZS signed ongoing (through the present)
> contracts with ███████ Germany for Incentive Compensation
> Technology services; and (3) ███████ remains a current client of
> ZS.

Synygy Mot. ¶ 30, citing Synygy Mot. Ex. J at 30-37, and Ex. K (Redding Dep.) at 68-78.

In its response to Synygy's motion for summary judgment, ZS contends that a reasonable

jury could find that ZS was harmed by the statements in the Synygy press release, specifically

noting ███████'s request for "assurances" after it reviewed the Synygy press release and the

costs it claims it incurred as "damage-control" expenses in its response to the Synygy press

release.  See ZS Opp'n.

## I.    Defamation

ZS claims that Synygy is liable for defamation because "the [Synygy] press release

accuses ZS of being an ongoing software thief and the purpose of the press release was to make

clients and prospects believe that 'ZS is wrong' to the point that they 'would have pity on

Synygy." ZS Opp'n Mem. at 26, citing id. Ex. 1, Dep. Ex. 70. Synygy contends that summary

judgment is warranted in its favor on ZS' defamation claims because "[t]he statements contained

within the [Synygy] Press Release are true," and because "ZS has not shown any damages . . . ."

Synygy Mem. at 14, 20.

In Pennsylvania,

> [i]n an action for defamation, the plaintiff has the burden of
> proving, when the issue is properly raised:  (1) The defamatory
> character of the communication.  (2) Its publication by the
> defendant.  (3) Its application to the plaintiff.  (4) The
> understanding by the recipient of its defamatory meaning.  (5) The
> understanding by the recipient of it as intended to be applied to the
> plaintiff.  (6) Special harm resulting to the plaintiff from its
> publication.  (7) Abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. Ann. § 8343(a).  "[T]he defendant has the burden of proving, when the issue is

properly raised:  (1) The truth of the defamatory communication.  (2) The privileged character of

the occasion on which it was published.  (3) The character of the subject matter of defamatory

comment as of public concern."  42 Pa. Cons. Stat. Ann. § 8343(b).  A defamatory

communication is one that tends to "harm the reputation of another so as to lower him in the

estimation of the community or to deter third persons from associating with him."  Wilson v.

Slatalla, 970 F. Supp. 405, 415 (E.D. Pa. 1997).

A.     **Truth**

Synygy contends that it has a valid defense to ZS' defamation claim because, "insofar as

the [Synygy] Press Release alleges that ZS knowingly copied and misappropriated components

of Synygy's sales compensation software and other intellectual property, it is in fact true . . . ."

Synygy Mem. at 19.  ZS counters that "Synygy has not come close to demonstrating the absence

of a genuine dispute about the truth of the [Synygy] press release.  To the contrary, abundant

issues exist."  ZS Opp'n at 23.  I agree with ZS that questions of material fact remain and will

not grant summary judgment in Synygy's favor on ZS' defamation claims on the basis of

Syngy's argument that the Synygy press release was true.

Although I have already found that "there is sufficient evidence of copying to require that

Synygy's copyright claim with respect to the incentive compensation report scorecards be

submitted to a jury," Synygy, Inc. v. ZS Assocs., Inc., No. 07-3536, 2015 WL 899408, at *38

(E.D. Pa. Mar. 3, 2015), this is not conclusive with respect to the truth of the statement contained

in the Synygy press release – that "ZS . . . *knowingly and improperly copied and*

*misappropriated* components of Synygy's sales compensation software and other intellectual

property." Synygy Mot., Ex. D (emphasis added). Further, I have also already found that

genuine issues of material fact required denial of defendants' motion for summary judgment on

plaintiff's copyright infringement claim with respect to Synygy Macros No. 1 and No. 2. Id. at

*37 (citing testimony from "defendants' expert Cliff Ragsdale . . . that a number of reports

delivered by ZS to Novo contain macros which are identical to the macros copyrighted by

Synygy . . ."). Even if it were true that ZS copied Macros No. 1 and 2, material questions of fact

remain with respect to whether ZS made copies "knowingly and improperly." Accordingly, I

find that material questions of fact remain with respect to whether Synygy may use truth as a

valid defense to ZS defamation claims.

**B.    Damages**

Synygy also argues that ZS' defamation claim cannot withstand summary judgment

because "ZS has not shown any damages, general or special, as required to maintain its

[d]efamation claims against Synygy." Synygy Mot. at 20. I agree with Synygy that ZS has not

met its burden to establish that it suffered damages as a result of the Synygy press release.

Accordingly, I will grant summary judgment in favor of Synygy with respect to ZS' claim for

defamation

### 1.    Defamation per se vs. ordinary defamation

ZS argues that the statements in Synygy's press release, if false, qualify as defamation

per se.  ZS Opp'n at 26.  Synygy contends that it "does not concede that the [Synygy] Press

Release is defamatory, generally, nor that it is slander per se."  Synygy Mem at 24.  However,

for purposes of its summary judgment motion, Synygy "assume[s], viewing the evidence most

favorable to ZS, that the court will analyze the Press Release under case law related to slander

per se as the Press Release arguably touches upon business misconduct."  Id.

"Statements by a defendant imputing to the plaintiff . . . conduct incompatible with the

plaintiff's business constitute slander per se."  Restatement (Second) of Torts § 570(c), quoted in

Brinich v. Jencka, 757 A.2d 388, 397 (Pa. Super. Ct. 2000).  In other words, a statement is

defamatory per se when "the speaker imputes to another conduct, characteristics, or a condition

that would adversely affect [it] in [its] lawful business or trade . . . ."  Walker v. Grand Cent.

Sanitation, Inc., 634 A.2d 237, 241 (Pa. Super. Ct. 1993); see also Parexel Int'l Corp. v.

Feliciano, No. 04-CV-3798, 2008 WL 2704569, at *3 (E.D. Pa. July 3, 2008) ("A statement

imputing business misconduct may be defamation per se if it ascribes to another's conduct,

characteristics or a condition that would adversely affect his fitness for the proper conduct of his

lawful business.") (citations and internal quotations and alteration omitted).  In Joseph v.

Scranton Times L.P., 959 A.2d 322, 344 (Pa. Super. Ct. 2008), the Superior Court held that

"[w]ith words that are actionable per se, only general damages, i.e., proof that one's reputation

was actually affected by defamation or that one suffered personal humiliation, or both, must be

proven; special damages, i.e., out-of-pocket expenses borne by the plaintiff due to the

defamation, need not be proven."  "A plaintiff does not have to prove special harm when the

-12-

words constitute defamation per se." Parexel, 2008 WL 2704569, at *3; see also Walker, 634

A.2d at 244 (same).

Thus, if the Synygy press release is defamatory per se, ZS must show that it suffered

general damages to withstand Synygy's motion for summary judgment. If the Synygy press

release is not defamatory per se, ZS must set forth sufficient evidence to show that it suffered

special damages. As is further set forth below, I find that ZS has not set forth sufficient evidence

of either general or special damages and thus has not met its burden to support its claim for

defamation.

### 2.    Presumed Damages

I consider first whether presumed damages are available to ZS. "'Presumed damages'

allow a defamation plaintiff to recover compensatory damages without proving the defamatory

statement caused actual harm. The rationale for this approach is that it may be unfair to require

proof of actual harm to reputation because reputational injury is difficult to prove and measure."

Franklin Prescriptions, Inc. v. N.Y. Times Co., 424 F.3d 336, 341 (3d Cir. 2005). Ordinarily, in

Pennsylvania, even in cases of defamation per se, a plaintiff "must prove general damages from a

defamatory publication and cannot rely upon presumed damages." Rentzell v. Dollar Tree

Stores, Inc., No. 10-4270, 2012 WL 707005, at *4 (E.D. Pa. Mar. 5, 2012); see also Walker v.

Grand Cent. Sanitation, Inc., 634 A.2d 237, 242 (Pa. Super. Ct. 1993) (explaining that

Pennsylvania law will not apply presumed damages and Plaintiff must prove general damages to

reputation). ZS argues that there is an exception to the no-presumed damages rule "where a

defendant acts with 'actual malice' – i.e., intentionally or with reckless disregard for the

truth . . . ." ZS' Opp'n at 27. Synygy contends that "presumed damages are not

recoverable . . . " and that ZS' arguments "relative to presumed damages [are] incorrect as a

matter of law." Synygy Reply at 8 n.8.

The Superior Court of Pennsylvania in <u>Joseph v. Scranton Times, L.P.</u>, 89 A.3d 251, 272 (Pa. Super. Ct. 2014), held that "presumed damages do indeed remain available upon a showing of actual malice." The Court explained "that, because Pennsylvania provides the utmost protection of reputational interests, and awarding presumed damages upon a showing of actual malice is permissible under the First Amendment, such damages remain available under Pennsylvania law." <u>Id.</u> at 273; <u>see also</u> <u>Company Wrench v. Highway Equip. Co.</u>, No. 10-1763, 2014 WL 4546793, at *11 (W.D. Pa. Sept. 12, 2014) (granting a new trial on presumed damages and holding that the verdict form should have provided the jury with an opportunity "to answer a question regarding actual-malice-based presumed damages stemming from [the defendant's] statement in [an] email regarding one of the Plaintiff's financial transactions, [that] 'for sure, this was done to alter the appearance of their financial condition'"). <u>But see</u> <u>Synygy, Inc. v. Scott-Levin, Inc.</u>, 51 F. Supp. 2d 570, 581 (E.D. Pa. 1999) aff'd sub nom. <u>Synygy, Inc. v. Scott-Levin</u>, 229 F.3d 1139 (3d Cir. 2000) (expressing doubts as to whether a corporate defendant should be subjected to a claim for defamation per se).[6]

The question then is whether ZS can here rely on presumed damages to withstand

---

[6]      The Court in <u>Synygy Inc. v. Scott-Levin</u> explained:

> I have serious reservations about whether the doctrine of defamation per se is appropriately applied to corporate entities. . . . A corporation . . . cannot be embarrassed or humiliated. A corporation's analogue to humiliation would be damage to reputation – an injury that should translate into a pecuniary loss. If a corporation cannot point to loss of revenues or profits, for what are we compensating it? Should the law allow corporations to avoid showing special harm by taking advantage of an exception so clearly created to protect individuals? The rule of defamation per se as it applies to corporations has outrun its reason.

51 F. Supp. 2d 570, 581 (E.D. Pa. 1999).

-14-

Synygy's summary judgment motion, i.e., whether material questions of fact remain as to

whether ZS can show actual malice. Actual malice is "a term of art denoting deliberate or

reckless falsification." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 499 (1991).

Whether the record evidence in a defamation case is sufficient to support a finding of actual

malice is a question of law. Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 685

(1989). In order to show "actual malice," there must be, at a minimum, proof that the statements

were made with reckless disregard for the truth. Id. at 667. "Reckless disregard" requires a

showing that Synygy either "in fact entertained serious doubts as to truth of" the Synygy press

release, St. Amant v. Thompson, 390 U.S. 727, 731 (1968), or had a "high degree of awareness

of . . . probable falsity." Garrison v. Louisiana, 379 U.S. 64, 74 (1964). "[O]bjective

circumstantial evidence" may be sufficient to show actual malice. Such circumstantial evidence

can override [Synygy's] protestations of good faith and honest belief that the [Synygy press

release] was true." Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069, 1090 (3d Cir. 1988).

However, "the actual malice standard is not satisfied merely through a showing of ill will or

'malice' in the ordinary sense of the term." Harte-Hanks, 491 U.S. at 666.[7] ZS argues that it

"can rely on presumed damages because there is ample evidence from which a reasonable jury

could conclude that Synygy acted either intentionally or recklessly in publishing the defamatory

communications." ZS' Opp'n at 28 (citation and internal quotation omitted). I disagree.

---

[7]      In Harte-Hanks, the Supreme Court considered circumstantial evidence of a
newspaper's motives for publishing a libelous story about a candidate for municipal judge whom
the newspaper had not endorsed. Id. at 664-668. The Court considered the newspaper's
motives: its interest in running a story that discredited the story of its rival newspaper and its
interest in the reelection of the opposition candidate which it had endorsed. Id. at 664-65.
Ultimately, the Supreme Court found that actual malice could be inferred when considering the
newspaper's motives combined with other strong evidence that the newspaper's witness was not
reliable and the newspaper had intentionally avoided taking action that would have either
confirmed or dispelled any doubts about the story's veracity. Id. at 692-93.

In support of its argument ZS cites the testimony of Synygy CEO Mark Stiffler who admitted that he did not know how long it had taken to write the software macros, ZS Opp'n, Ex. 18 (Stiffler Dep.) at 340:6-24, despite having been quoted in the Synygy press release as saying that Synygy's software was the result of "many years" of investment in product development. Synygy Mot., Ex. D. But Stiffler did not testify that it had not in fact taken years to develop the software macros. Instead, he testified only that he did not know precisely how long the development process had taken. ZS also notes that the Synygy press release expressed Stiffler's view that ZS "continue[d] to use [Synygy's] software," id., although Stiffler testified that he did not have "personal knowledge" whether ZS ever used Synygy's macrocode. ZS Opp'n, Ex. 18 (Stiffler Dep.) at 84:17-85:8. But Stiffler's testimony regarding his lack of personal knowledge is not evidence that Stiffler knew the statement in the Synygy press release about ZS' continued use of the software was false or that he in fact entertained serious doubts as to its truth. At most, any discrepancies between Stiffler's statements in the Synygy press release and his testimony are evidence of negligence, not the recklessness required to support a finding of actual malice.

ZS also contends that emails Stiffler sent about the Synygy press release "show that the true motive for the [Synygy] Press release was not to accurately portray reality, but to cast ZS in as bad a light as possible." Id. However, "actual malice may not be inferred alone from evidence of personal spite, ill will or intention to injure on part of the writer." Harte-Hanks, 491 U.S. at 667 n.7. "[C]ourts must be careful not to place too much reliance on such factors." Id. at 668. In the email Stiffler wrote on August 4, 2009, shortly before the publication of the Synygy press release, Stiffler explained that the "goal is to get our prospects and clients to have pity on us and to believe that we are right and ZS is wrong." ZS' Opp'n Ex. 1, Dep Ex. 70. ZS also cites a September 15, 2008 email in which Stiffler discussed a "draft concept" press release

regarding Synygy's suit against ZS "for theft of intellectual property." ZS' Opp'n at Ex. 23.

Stiffler wrote that his "goal [was] to create a public battle and put all companies on notice that

ZS cannot be trusted." Id. He wrote: "I want Synygy to be perceived in the press as the 'good

guy' which has been wronged by the 'bad guy.' I would want our current clients to empathize

with us and our former clients to be concerned that they might be dragged into the legal mess."

Id. ZS argues that, when combined with Stiffler's testimony, the statements in these emails are

sufficient to permit a jury to conclude that Synygy's statements in the Synygy press release

"were, at the very least, made with a reckless disregard of the truth." ZS Opp'n at 29. But

Stiffler's emails are not sufficient to demonstrate the existence of a genuine dispute as to whether

Synygy entertained serious doubts as to the truth of the statements made in the Synygy press

release. On the record before me, Stiffler's emails could just as likely be seen as an expression

Stiffler's firmly-held belief that ZS had, in fact, wronged Synygy as they could be seen as an

expression of ill-will or a malicious intention to injure ZS. Accordingly I find that ZS cannot

rely on presumed damages to support its defamation claims.

### 3.    General Damages

Because ZS cannot rely on presumed damages, I must consider whether it has set forth

sufficient evidence of general damages to permit its defamation claims to withstand summary

judgment. General damages require "proof that one's reputation was actually affected by the

slander, or that [the plaintiff] suffered personal humiliation, or both." Walker, 634 A.2d at 242.

"These are distinguished from 'special' actual damages which are economic or pecuniary

losses." Sprague v. Am. Bar Ass'n, 276 F. Supp. 2d 365, 368-69 (E.D. Pa. 2003). ZS argues

that "even if damages cannot be presumed, there is ample evidence from which a jury could

reasonably find general damages . . . ." ZS Opp'n at 29. But Synygy contends that "there has

been absolutely no testimony or other evidence, not even a mere identification of any third party

corporation, entity or individual who would provide any testimony that their opinion of ZS or

their purchasing decision was negatively affected by the press release.  Synygy Mem. at 24.

     I find that the evidence that ZS has set forth on summary judgment is insufficient to raise

a material question of fact as to whether the Synygy press release in any way harmed ZS'

reputation.  "In determining if a Plaintiff has demonstrated any loss to reputation, it must be

measured by the perception of others, rather than that of the plaintiff himself because reputation

is the estimation in which one's character is held by his neighbors or associates."  Pennoyer v.

Marriott Hotel Servs, Inc., 324 F. Supp. 2d 614, 619 (E.D. Pa. 2004) (internal citations and

quotation omitted).  "[H]e or she must offer actual specific evidence of such general damages."

Beverly Enters. Inc. v. Trump, 182 F.3d 183 n.2 (3d Cir. 1999).  Although ZS has claimed that

the Synygy press release prompted inquiries from ▮▮▮▮▮, ▮▮▮▮▮ and ▮▮▮▮, see Synygy

Mot. Ex. H at 5-6, in responding to Synygy's motion for summary judgment, ZS has not set

forth any testimony from any employee of any of those companies.  Indeed, ZS has not set forth

any testimony from any third party who altered its opinion of ZS as a result of the Synygy press

release.  Instead, ZS relies on testimony from its own employees about their interactions with

▮▮▮▮▮, ▮▮▮▮ and ▮▮▮▮ following the publication of the Synygy press release.  This is not

enough (even assuming arguendo that the ZS' employees testimony consists of anything other

than inadmissible hearsay[8]).

---

[8]    See Brooks Power Sys., Inc. v. Ziff Commc'ns, Inc., No. 93-3954, 1994 WL
444725, at *3 (E.D. Pa. Aug. 17, 1994) (finding that a statement from a distributor "regarding
. . . unidentified customers' reasons for not purchasing . . . products of [the plaintiff was]
inadmissible hearsay").  In Brooks, the Court considered evidence of alleged pecuniary loss that
the plaintiff claimed was due to a commercially disparaging magazine article.  Id. at *5-*7.  The
evidence included, inter alia, testimony from Mr. Brooks, the president of the plaintiff who
"aver[red that a client told him . . . that he would not purchase plaintiff's products, because the

Even if I could rely on the testimony of ZS' own employees, it would be insufficient to meet ZS' burden on summary judgment. Their testimony does not raise a material question of fact as to whether the Synygy press release impaired ZS' reputation or standing in the business community. Instead, Shenbaga's testimony shows that, although the Synygy press release resulted in "many more discussions between ZS and ████ to convince [████] that [ZS] would be able to deliver the work," ultimately ZS has provided additional services to ████ since the issuance of the Synygy press release and has "very good" standing with ████ "based on [ZS'] growing relationship with them." See, e.g., ZS' Opp'n Ex. 26 (Shenbaga Dep.) at 37:13-17, 37:23-39:21, 81:8-16, 82:4-6. Redden's testimony confirms that since the Synygy press release was issued, ZS has entered into continuing contracts to provide IC administration services to ████ in Germany and Italy. Synygy Ex. I (Redden Tr.) at 74:19-75:9, 75:21-77:11. Redden also testified that ████ was a client of ZS in 2009 and remains a client today, although not for IC services. Synygy Ex. K (Redden Tr.) at 86:2-8, 87:8-16. Finally, Redden testified that, since August 2009, it had never come to his attention that a client of ZS had cancelled their contract with ZS for IC administration services as a result of the Synygy press release, nor had it come to his attention that any sales process with a prospective client was cancelled as a result of the Synygy press release. Id. at 90:12-16; 121:10-15. On the record before me, I find that a reasonable jury could not conclude that the Synygy press release had the requisite reputational effect.

### 4. Special Damages

Even supposing that the meager reputational evidence set forth by ZS were sufficient to meet its burden to show general damages and even if the Synygy press release is not defamatory

---

. . . product was poorly constructed and a safety hazard." Id. at *6. The Court found that "Mr. Brooks' averment regarding comments by [the client] is . . . inadmissible hearsay."

per se, ZS' claim for defamation would still fail because ZS has not set forth sufficient evidence to show that it suffered special damages as a result of the Synygy press release.

Other than in an action for defamation per se, "[i]n an action for defamation, the plaintiff has the burden of proving . . . [s]pecial harm resulting to the plaintiff from its publication . . . ." 42 Pa. Cons. Stat. Ann. § 8343. "Special harm requires proof of a specific monetary or out-of-pocket loss as a result of the defamation." Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d at 580, citing Restatement (Second) of Torts, § 575. ZS argues that "even if [it] is required to prove special damages in the form of dollar-denominated economic or pecuniary losses, ZS has provided that evidence." ZS' Opp'n at 32. Specifically, ZS cites "the real and concrete expense i[t] incurred in its efforts to mitigate the damages from Synygy's press release," an expense its expert found to amount to $71,652. Id., citing ZS' Counterstatement of Facts § X and ZS' Opp'n Ex. 2 (Gering Rpt.) at 12-13.

In support of its argument, ZS cites Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990), a commercial disparagement case where, following a default judgment, the Court of Appeals upheld the district court's award of "compensation for the damages which [Comdyne] incurred in attempting to mitigate damages to its reputation flowing from the defendants defamatory' statements." Comdyne does not, however, support a finding that ZS may satisfy its burden to show special harm by relying solely on evidence of remediation costs. It merely found that such costs may be recoverable once liability for defamation has been established. Since the defendant in Comdyne was found liable for defamation as the result of a default judgment, the Court had no occasion to consider the question which is now before me – whether remediation costs alone are sufficient to establish special damages and liability for defamation per quod.

Synygy argues that remediation costs cannot serve as proof of special damages. See

Synygy Mem. at 29-31. I agree. "[S]pecial harm must result from the conduct of <u>a person other</u> <u>than the defamer or the one defamed</u> and must be legally caused by the defamation." Restatement (Second) Torts § 575 cmt. b (emphasis added). ZS' own expenditures, expenditures which it incurred in order to address its perception that the Synygy press release had damaged its reputation, are not sufficient to raise a material question of fact as to whether it suffered the requisite special damages. As Synygy explains, "if ZS' proposed damage calculations were sufficient, . . . any time whatsoever a corporation internally sent a single email related to an allegedly defamatory publication there would be special damages sufficient to overcome summary judgment." Synygy Mem. at 31. Although ZS suspects that clients or potential clients declined to work with it because of the content of the Synygy press release, it has not provided any direct proof of this. Accordingly, I find that ZS has not met its burden to prove special harm. <u>See</u> <u>Pennoyer</u>, 324 F. Supp. 2d at 618 (finding the plaintiff had not established special harm where he had "not identified any economic or pecuniary losses suffered as a direct result of the [defendant's] communications to others").[9] Therefore I will grant summary judgment in favor of Synygy with respect to ZS' claim for defamation.

## II.   Commercial Disparagement

Synygy contends that summary judgment is warranted on ZS' claim for commercial disparagement because ZS has not proven the requisite "pecuniary loss." Synygy Mem. at 31-32. I agree.

"Because the tort of disparagement protects against pecuniary loss, the elements of the cause of action are much more stringent than those for defamation." <u>Zerpol Corp. v. DMP</u> <u>Corp.</u>, 561 F. Supp. 404, 408-09 (E.D. Pa. 1983). "[G]eneral loss of reputation or character is

---

[9]     My conclusion here is unaffected by my decision to permit substitution of ZS and Novo's damages expert. <u>See</u> supra n. 5.

insufficient for recovery." <u>Brooks Power Sys., Inc. v. Ziff Commc'ns, Inc.</u>, No. 93-3954, 1994

WL 444725, at *3 (E.D. Pa. Aug. 17, 1994).

> The publication of a disparaging statement concerning the business of another is actionable under Pennsylvania law where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will recognize in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.

<u>Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.</u>, 809 A.2d 243, 246 (Pa. 2002), <u>citing</u>

Restatement (Second) of Torts § 623(A); <u>see also</u> <u>Neurotron, Inc. v. Med. Serv. Ass'n of Pa.,</u>

<u>Inc.</u>, 254 F.3d 444, 448-49 (3d. Cir. 2001) ("We have been referred to nothing which suggests to

us that the Pennsylvania Supreme Court would take any other approach to defining the tort of

injurious falsehood than that followed by <u>Pro Golf</u>.").  Importantly, "a plaintiff claiming

commercial disparagement <u>must</u> prove actual pecuniary loss." <u>SNA, Inc. v. Array</u>, 51 F. Supp.

2d 554, 566 (E.D. Pa. 1999) <u>aff'd sub nom.</u> <u>Silva v. Karlsen</u>, 259 F.3d 717 (3d Cir. 2001)

(emphasis added).  "Plaintiff may establish direct pecuniary loss either by a general diminution

in sales or specific lost sales." <u>Brooks</u>, 1994 WL 444725, at *3.

Accordingly, in the context of a motion to dismiss, it has been held that to successfully

plead a cause of action for disparagement a plaintiff must allege:

> facts showing an established business, the amount of sales for a substantial period preceding publication, and amount of sales subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and [when applicable] the facts showing the plaintiff could not allege the name of particular customers who withdrew or withheld their custom.

<u>Forum Publ'ns, Inc. v. P.T. Publishers, Inc.</u>, 700 F. Supp. 236, 244 (E.D. Pa. 1988).  It follows

that on summary judgment a plaintiff must set forth evidence sufficient to show either a general

diminution in sales and "evidence of a causal connection between [the disparaging statement] and the decrease in sales" or specific lost sales. Brooks, 1994 WL 444725, at *4 (finding that "[w]ithout any evidence of causation, plaintiff cannot rely only on an unexplained general diminution in sales to establish pecuniary loss").

Here, ZS' efforts to prove pecuniary loss are not sufficient to meet its burden on summary judgment. First, as Synygy argues, ZS' expert

> has done nothing to show 'special harm' or pecuniary damage that is required to in order to maintain a cause of action for commercial disparagement . . . . He clearly and unequivocally limited his analysis to the internal time spent by ZS employees related to the press release as well as external costs ZS voluntarily expended in drafting and publishing a counter press release.

Synygy Mem. at 34, citing Synygy Ex. N. at 208-09. "A disparaging statement causes financial loss if its publication is a substantial factor causing a third person not to buy the thing disparaged." Brooks, 1994 WL 444725, at *4. "Commercial disparagement, unlike defamation, requires stringent proof of special damages; [ZS] must prove that" the Synygy press release reduced the marketability of its IC services, "not that lost sales occasioned by a tarnished reputation resulted in general damages." Id. ZS' expert's opinion regarding the amount it expended internally in order to respond to the Synygy press release is not "evidence of a causal connection between the [press release] and [any] decrease in sales."[10] Id. As my colleague Judge Shapiro explained in Brooks,

> [r]ehabilitation costs alone are not sufficient to establish pecuniary loss, because unless other pecuniary loss was occasioned by the [press release], the "rehabilitation" was not reasonably necessary. The need for rehabilitation derives from direct pecuniary loss; plaintiff cannot establish its *prima facie* case through expenditures on rehabilitation. To hold otherwise would permit a plaintiff to

---

[10]     My conclusion here is also unaffected by my decision to permit substitution of ZS and Novo's damages expert. See supra n.5.

> establish direct pecuniary loss simply by spending money on
> "rehabilitation" even if no direct damage had been done by the
> allegedly disparaging statement.[11]

1994 WL 444725, at \*7

ZS "has produced no evidence linking reduced sales to [████ or to ████ or to any other specific client] to the [Synygy press release.]" Id. at \*5. Nor has ZS set forth evidence of a general diminution in sales of its IC services. Instead, there is testimony from Shenbaga that ████████ signed a contract with ZS for IC services within "a month or two" of the Synygy press release, ZS' Opp'n Ex. 26 (Shenbaga Dep.) at 51:23-52:9, and, according to Shenbaga, ZS' revenue from IC administration work for ████ increased twenty percent between 2009 and July 2013. Id. at 37:23-39:21. And there is testimony from Redden that after the Synygy press release ZS entered into contracts to provide IC administration services to ████ in Germany and Italy. ZS' Opp'n Ex. 16 (Redden Dep.) at 74:19-75:4, 75:21-77:6. Without evidence to show that ZS' sales of IC services were diminished as a result of the Synygy press release, ZS's commercial disparagement claim cannot stand. Cf. Brooks, 1994 WL 444725, at \*5 (declining to find evidentiary support for a claim for commercial disparagement in testimony from a distributor client who "believe[d] other customers stopped buying plaintiff's products from him because of the [allegedly disparaging] article" where there was "no averment that [the distributor client] stopped buying [the product in question] from [the plaintiff] because of the article or for

---

[11]     In its response to Synygy's motion ZS argues that "[t]he Third Circuit in Comdyne specifically approved damage-control costs as a permissible category of damages under New Jersey law, applying general principles of damages-mitigation law. There is no reason in law, or logic, for Pennsylvania to adopt a different rule." ZS' Opp'n Mem. at 33-34, citing Comdyne, 908 F.2d 1142. Judge Shapiro explicitly rejects this argument in Brooks, 1994 WL 444725, at \*7, holding that "[t]he Third Circuit decision [in Comdyne] that a plaintiff prevailing by default judgment was entitled to recover mitigation costs was under the New Jersey law of defamation. . . . Under Pennsylvania law applicable here, plaintiff cannot recover the costs of rehabilitation as mitigation unless it can establish the direct pecuniary loss element of commercial disparagement."

any other reason."). I will grant summary judgment in Synygy's favor with respect to ZS' claim for commercial disparagement.

## III.   Lanham Act

A claim under the Lanham Act is distinct from one for commercial disparagement or defamation because it "is not a cause of action for maligning the company itself, but rather a remedy for misrepresentation in advertising about a particular product or commercial service." Synygy v. Scott-Levin, 51 F.Supp.2d at 578. In order to make out its Lanham Act claim, ZS must show that

> 1) the defendant has made false or misleading statements as to his or her or another's product or services; 2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) the deception is material in that it is likely to influence purchasing decisions; 4) the advertised goods traveled in interstate commerce; and 5) there is a likelihood of injury to the plaintiff in terms of declining sales and loss of good will.

Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d at 575, citing U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 922-23 (3d Cir. 1990). "If a plaintiff proves that the challenged commercial claims are "literally false," a court may grant relief without considering whether the buying public was actually misled." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002). Synygy argues that "to the extent that the Synygy Press release alleges that ZS knowingly accessed, copied, and misappropriated Synygy's software and other intellectual property, it is in fact true as belied by the record," Synygy Mem. at 38 and because Synygy's "press release was not literally false, ZS' Lanham Act claim fails as a matter of law." Synygy Reply at 15. ZS contends that "[t]here is ample evidence from which a reasonable jury could find that the Synygy press release's statements about stolen software are literally false." ZS' Opp'n Mem. at 35.

"A 'literally false' message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." Novartis Consumer Health, 290 F.3d at 586-87 (citation and internal quotation omitted). "[O]nly an *unambiguous* message can be literally false. The greater the degree to which a message relies upon the viewer . . . to integrate its components and draw the apparent conclusion . . . the less likely it is that a finding of literal falsity will be supported." Id. at 587 (emphasis in original, citations and internal quotation omitted). Because I previously found that genuine issues of material fact remain with respect to whether ZS copied Synygy Macros No. 1 and No. 2 and/or Synygy's incentive compensation report scorecards, Synygy, Inc. v. ZS Associates, Inc., No. 07-3536, 2015 WL 899408, at *36-38 (E.D. Pa. Mar. 3, 2015), I find that material questions of fact remain with respect to whether ZS has met its burden to show that the statements in the Synygy press release are literally false. If ZS proves literal falsity at trial, the actual deception presumption will be invoked and ZS will be entitled to appropriate injunctive relief. Ecore Int'l, Inc. v. Downey, No. 12-2729, 2015 WL 127316 (E.D. Pa. Jan. 7, 2015) (holding that actual deception or a tendency to deceive and materiality of the deception may be presumed where a representation is literally false, "at least in the Third Circuit, . . . only . . . when seeking injunctive relief rather than damages").

However, to the extent that ZS seeks to recover both monetary damages[12] and injunctive relief for its Lanham Act claim, ZS must do more than show that the Synygy press release was literally false. "[T]here are different standards of proof for different types of remedies under the

---

[12]     See ZS Compl. (Dkt. No. 1 in Civ. A. 10-4274) at p. 10-11 ("Wherefore, [ZS prays] that the Court enter judgment in [its] favor and against Defendant Synygy as follows: . . . Award [ZS] general compensatory and consequential damages, including damages for loss of business relations, damages for loss of growth opportunities, damages for loss of company valuation, damages for loss of reputation and damages for loss of all benefits . . . .").

Lanham Act." Champion Labs., Inc. v. Parker Hannifin Corp., 07-12493, 2009 WL 2168322, at

*2 (July 17, 2009).  "A party seeking both an injunction and damages, as [ZS] does here, must

meet both the standard of proof for an injunction as well as that for damages.  Vexcon Chems.,

Inc. v. Curecrete Chem. Co., No. 07-943, 2008 WL 834392, at *3 (E.D. Pa. Mar. 28, 2008).

> Where [a] plaintiff seeks *injunctive relief* and shows that a claim is
> literally false, a court need not consider whether the public is
> misled.  Where, however a plaintiff seeks *monetary damages*,
> proof of actual deception is required.  This does not mean that
> plaintiff bears the burden of detailing individualized loss of sales;
> however, plaintiff must show some customer reliance on the false
> advertising.

Gallup, Inc. v. Talentpoint, Inc., No. 00-5523, 2001 WL 1450592, at *13 (E.D. Pa. Nov. 13,

2001); see also Castrol Inc. v. Pennzoil, Co., 987 F.2d 939, 941043 (3d Cir. 1993) (affirming

trial court decision granting injunctive relief but denying monetary damages despite finding of

literal falsity).

Absent literal falsity, "a Lanham Act violation may still be established by proving that

the [relevant commercial speech] makes a false or misleading claim and that a substantial portion

of consumers actually understand the [commercial speech in question ] to be making that claim."

Synthes, Inc. v. Emerge Med., Inc., 25 F. Supp. 3d 617, 716 (E.D. Pa. 2014).  In other words, ZS

"cannot obtain [monetary] relief by arguing how consumers *could* react; it must show how

consumers *actually do* react.  Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222,

228-29 (3d Cir. 1990) (emphasis in original) (affirming district court's conclusion that the

plaintiff had failed to meet its burden of proof where it "failed to advance actual evidence of

consumer misinterpretation"); see also First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.,

No. 12-2568, 2014 WL 7409537, at *13 (D. Md. Dec. 30, 2014) ("misleading statements require

extrinsic evidence of confusion or deception"); Nellcor Puritan Bennett LLC v. Cas Med. Sys.,

Inc., 11 F. Supp. 3d 861, 870 (E.D. Mich. 2014) ("To obtain monetary damages under the

Lanham Act for false advertising that is literally true, but misleading, the plaintiff must prove

actual deception of consumers."). Although a plaintiff seeking damages under section 43(a)

"need not quantify loss of sales as that goes to the measure of damages, not plaintiff's cause of

action," it "must establish customer reliance . . . ." Warner-Lambert Co. v. Breathasure, Inc.,

204 F.3d 87, 92 (3d Cir. 2000). Synygy argues that even if the Synygy press release "is not

literally false, but [is instead] misleading in its context," summary judgment should be entered in

its favor because ZS has "f[a]iled to show that the Press Release has misled, confused or

deceived the consuming public." Synygy Mem. at 39.

It has been held that "[t]he success of the claim usually turns on the persuasiveness of a

consumer survey." AT&T Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1443 (3d

Cir. 1994); see also PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 123 (4th Cir.

2011) (finding that consumer surveys are typically used to "establish that the advertising tends to

deceive or mislead a substantial portion of the intended audience"); Suntree Techs., Inc. v.

EcoSense Int'l, Inc., 802 F. Supp. 2d 1273, 1288 (M.D. Fla. 2011) ("In order to prove deception,

consumer survey research is often "key" evidence . . . .") (citation omitted). ZS has not set forth

any consumer survey evidence in support of its Lanham Act claim.

> Even assuming such a survey is not absolutely required, having
> reviewed the evidence that [ZS has] put forward as to consumer
> confusion, the Court easily concludes that it does not demonstrate
> that consumers . . . were actually deceived by the [Synygy press
> release] nor that the [Synygy press release] had a tendency to
> deceive a substantial portion of

customers. FMC Corp. v. Summit Agro USA, LLC, No. 14-51, 2014 WL 6627727, at * 9 (D.

Del. Nov. 14, 2014). "[I]f full-blown consumer surveys or market research are not available, the

plaintiff still must provide some sort of expert testimony or similar evidence." Suntree Techs.,

802 F. Supp. 2d at 1288 (citation omitted).  ZS argues that "even if proof of consumer deception

[is] required" to support its claim, it "has presented ample evidence from which a jury could

reasonably find such deception." ZS Opp'n Mem. at 36.  Specifically, ZS contends that "there is

abundant evidence that at least one customer – ████████ – was actually deceived by Synygy's

statements about stolen software." Id.  ZS argues that "a reasonable jury could infer that because

████████, a sophisticated pharmaceutical company drew its conclusion, others would as well."

Id.  I find that this is not enough.

    As Synygy argues, the evidence ZS submits in support of its contention consists only of

"the inadmissible hearsay testimony of its own principal, Mr. Shenbaga." Synygy Reply at 16.

Shenbaga testified that ██████'s Director of Sales Operations, ████████████, showed

Shenbaga a copy of the Synygy press release and, according to Shenbaga, told Shenbaga "that he

would like for [ZS] to think about assurances that [ZS] could provide in the event that [ZS']

Javelin software would not be able to perform incentives administration work for ████████" ZS'

Opp'n Ex. 26 (Shenbaga Dep.) at 46:18-47:25. But ZS has not set forth any testimony from

████████ himself.  Nor has it set forth any testimony from any other client or prospective client

to support a finding that the Synygy press release had a tendency to deceive or mislead its

readers.  Further, even if Shenbaga's recounting of his conversation with ████████ were

admissible non-hearsay, it is not sufficient to raise a material question of fact as to whether the

Synygy press release had a tendency to cause a *substantial* portion of consumers to believe that

ZS had copied Synygy Macros No. 1 and No. 2 and/or Synygy's incentive compensation report

scorecards.  cf. Novartis Consumer Health, 290 F.3d 578, 594 (3d Cir. 2002) (holding that

survey evidence that fifteen percent of the respondents were misled was sufficient to establish

actual deception or a tendency to deceive).

My conclusion is supported by <u>CollegeSource, Inc. v. AcademyOne, Inc.</u>, No. 10-3542, 2012 WL 5269213, at *23 (E.D. Pa. Oct. 25, 2012) aff'd, 597 F. App'x 116 (3d Cir. 2015), where the plaintiff asserted a Lanham Act false advertising claim based on letters from AcademyOne that included statements "that CollegeSource filed copyright claims against AcademyOne, that CollegeSource attempted to preclude AcademyOne and other software providers from providing student transfer systems, and that CollegeSource claimed ownership of college catalog copyrights." The Court concluded that there was insufficient evidence that letters had a tendency to deceive the intended audience where CollegeSource submitted evidence that, as a result of the "letters, some schools contacted CollegeSource and expressed their concern, and at least one of CollegeSource's clients pulled their catalogs from CollegeSource databases." <u>Id.</u> Here, there is no more evidence that the Synygy press release had a tendency to deceive its intended audience than there was in <u>CollegeSource</u>. ZS has not met its burden to set forth sufficient evidence of consumer deception to support a claim for monetary damages under the Lanham Act.[13]

To the extent that it seeks injunctive relief, ZS may proceed to trial on its Lanham Act claim. For ZS to prevail, the jury must find that the Synygy press release was literally false.

An appropriate Order follows.

---

[13]     While the actual damages available under the Lanham Act may include remediation costs, they are not available to ZS unless ZS can establish a claim for monetary relief. Because ZS has not set forth sufficient evidence of consumer deception, I need not reach the question of whether damage control costs are recoverable as damages under the Lanham Act.